**E. L. BASDEN, Plaintiff in Error,**

v.

**Fred MILLS and Nellie Mills, husband and wife, Defendants in Error.**

**No. 42257.**

Supreme Court of Oklahoma.

June 9, 1970.

Rehearing Denied July 14, 1970.

Baumert & Cornish, Loren McCurtain, as counsel, McAlester, for plaintiff in error.

Charles V. Foor, Stipe, Gossett & Stipe, by Gene Stipe, McAlester, for defendants in error.

JACKSON, Justice:

In the trial court, plaintiffs Fred Mills and his wife sued defendants E. L. Basden and his wife for damages for fraud. Before the jury trial the action was dismissed as to Mrs. Basden and verdict was for plaintiffs and against defendant E. L. Basden for actual and punitive damages in the total amount of about $48,000.00. After plaintiffs filed a remittitur which was required by the trial court as an alternative to the granting of a motion for new trial, judgment was entered for plaintiffs in the amount of $1186.42 for actual damages and $25,000.00 for punitive damages. Defendant appeals.

Plaintiffs were the owners of a business property in Quinton, Oklahoma, which was subject to mortgages held by defendant Basden in the approximate amount of $12,000.00. The allegations of fraud arise out of a transaction for the sale of this property to a third party for $25,000.00. Briefly summarized, the allegations were that, after a course of conduct during which defendant gained the respect and confidence of plaintiffs and became their trusted business and financial advisor, defendant, in the course of assisting with and participating in the negotiation and consummation of this sale, fraudulently represented to plaintiffs, by his words and conduct, that under the instruments he prepared effectuating the sale, and which they signed, they would be paid for their "equity" in the property as soon as the transaction was completed, with money he would lend to the purchaser for that purpose.

In the briefs in this court, defendant argues eight propositions, most of which concern either the sufficiency or admissibility of the evidence, or the correctness of the instructions to the jury. The defendant did not testify at the trial, with the result that much of plaintiff's evidence, including some that only the defendant could deny, was uncontradicted. Also, he did not object to any of the court's instructions to the jury and did not offer instructions for the court's consideration.

The evidence shows that in 1956, plaintiff Mills, a barber and carpenter, began the construction of a building to be used as a combination residence-restaurant-service station. He did much of the work himself, stopping when he ran out of money, and beginning again when he was able to borrow some. Most of the money he borrowed during the early years came from a Mr. Etchison, from whom he had been borrowing money for many years. He also borrowed from banks and other sources.

The defendant, Mr. Basden, who was in the loan business, stopped at the building site several times to talk with plaintiff Mills and was aware of the slow progress being made. On one of these visits he offered to lend Mills money if he ever needed it. In 1961 Mills began to borrow money from Basden, and did so on several occasions thereafter. In each case, the plaintiff would tell Basden what he needed and for what purpose, and Basden would then write him a check. A day or two later Basden would come by the building site or plaintiff's barber shop with a promissory note and mortgage for plaintiff and his wife to sign; these were printed forms with only the total amount of the loan filled in. Mills testified that he trusted Basden to fill in the details; that he did so properly; and that Mills came to depend on the honesty, integrity and business judgment of Basden. Basden at all times expressed an interest in helping Mills complete the project and apparently did not require payments on the principal amount of any of the notes before the job was completed, but was satisfied with payments of the interest as it accrued. In response to inquiries from Mills as to how much he owed him and what the required payments would be, Basden told him they would wait till the job was completed and then decide how much he could afford in the way of payments. During this time Mills borrowed a total of about $12,000.00 from Basden and gave mortgages covering the building site, his home, some vacant lots in Quinton, the fixtures in his barber shop, and some restaurant fixtures.

The building was apparently completed in 1962, and the business was opened with the Mills family operating it, although Mills himself continued to operate his barber shop nearby. At that time he again asked Basden to "set me a payment" but Basden suggested that they wait to see how the business did before setting the monthly payment. This arrangement seems to have continued for some time, with Mills paying the interest and possibly a little on the principal.

About two years later, Mills, with Basden's approval, decided to sell his business in order to pay his indebtedness to Basden, and the smaller amounts he had borrowed from others before his dealings with Basden. Early in 1964 a Mr. Eppler, then living in New Mexico but owning a farm in Haskell County, Oklahoma, and some other property, came to see him. He agreed to pay Mills $25,000 for the property but indicated that he would have to borrow the money. Since Eppler was not acquainted with any bankers or money lenders in the vicinity, Mills said he would take him to see Basden.

In Basden's office in his home, Mills explained that he was selling his business to Eppler for $25,000, but that Eppler would need to borrow the money. Of course Basden already knew the extent of Mills' indebtedness to him. After hearing about the property Eppler owned, Basden said that he would make some investigations and that if Eppler owned what he said he did and owed no money on it, "I can handle it". At that time Basden suggested that "There should be a contract drawed up". Basden then drafted the contract while Mills and Eppler waited. It may be described as a rather informally drawn contract of sale between Mills and Eppler, reciting a consideration of $25,000, with $5,000 to be paid within six months together with interest at 8% per annum, and the remaining $20,000 to be paid in 120 monthly instalments of $242.66 each. Nothing was said in the contract about any existing promissory notes or the prior mortgages held by Basden. The first mention of a mortgage was in a sentence which required the buyer to keep the premises insured with a loss payable clause in favor of "first party or mortgage holder". It was also provided that the "$20,000 and $5,000 mortgages shall be secured by a first mortgage" on the property being sold, Eppler's farm in Haskell County, and his six acre home place near Carlsbad, New Mexico. The contract did not identify the "mortgage holder" or mortgagee. Mills and Eppler then signed the contract. Before they left Basden told them he would draw the mortgages later and suggested that a "possession agreement" was needed. After some discussion Mills agreed to give possession in two weeks and Basden told them he would draw the agreement later.

In the next few days Basden apparently made investigations as to Eppler's holdings and the value thereof. In one conversation with Mills he said that the Haskell County farm might be worth $40,000 or more, and that he would be "well secured for his money." In others, he suggested that Mrs. Eppler, whose signature was necessary on the mortgages, "acts like she doesn't want to go through with the deal", and that "if we don't get her name on the mortgage I won't be able to pay you your money".

About 4 days after the original conference Mills, Eppler and their wives were having coffee in the restaurant. Basden came in with the necessary instruments to close the transaction. He handed mortgages to Mr. and Mrs. Eppler to sign, and handed to Mills an instrument captioned "Agreement" for him and his wife to sign. Mills thought it was the "possession agreement", signed it without reading it, and handed it to his wife saying "Sign it, we have to move anyway". However, his wife read the "Agreement" and did not sign it. During this time Mills, being rather anxious as to whether Mrs. Eppler would sign the mortgages or not, was watching her. Basden took Mrs. Mills into the kitchen of the restaurant where Mrs. Mills told him she would not sign the instrument because

it provided that Basden was to get all of his money before the Mills got theirs. Basden then told her the instrument was "drawed up legally for my security", and that "When we get all the papers signed, you are going to get your money". On her inquiry, he also told her that Mr. Mills knew what he had signed. They then returned to the others and she signed the instrument. In the meantime, Mr. and Mrs. Eppler had signed the notes and mortgages, which named Basden as payee and mortgagee.

The instrument signed by the Mills was as follows:

"I, E. L. Basden, holds a first mortgage from Henry Eppler Jr and his wife Lorene Eppler, dated this 24th day of February 1964 in the amount of $25,000 Dollars, covering Lots 7, 8, 9, 4, 15, 16 & 18 of Block 54, Quinton, Okla., this also covers other lands in 7 North and Range 20 and 31 East, near Lequire on Mountain Creek in Haskell County, Okla., and tract of land at Calrsbad, N. Mex. There is a total of $13,410.80 due E. L. Basden and his wife Lou A. Basden of this $25,000.00, plus 8% interest due The Basdens and the balance due Fred Mills and Nellie Mills. E. L. Basden and Lou A. Basden are to be paid in full the $13,-410.80 plus 8% interest from Feb. 24th, 1964 until they are paid, then payments after Basdens are paid shall be made to Fred Mills and his wife Nellie.

Signed this 24th day of February, 1964."

(signatures of Mr. and Mrs. Basden and Mr. and Mrs. Mills)

"The above mortgage is made up of One $5,000 dated 2–24–64 and due August 20th, 1964 plus 8% interest. This the down payment. Then one note for $20,-000.00, payable in 120 payments of $242.66 the first payment due March 20th, 1964 and one each month thereafter until paid in full."

The day after the instruments were all signed, Basden called Mills, who had not yet given possession of the premises, to his office and said "I know that you thought when you and the man was making that deal up here, that I was going to pay you off". He then informed Mills that he was not going to do so. After protestations by Mills, Basden told Mills that if he would go ahead with the deal and help the Epplers get started, "I will let you have what money you made on your equity * * *".

However, Basden made no payments to Mills. During the ensuing 14 months, Mills operated a barber shop in Quinton and later one in McAlester. He had considerable difficulty in refinancing the obligations he had intended to pay with the "equity" he thought he would get from the sale of his business property. There was evidence that he made about $10.50 per day in the barber business, and that during the 14 months he lost a total of 81 days which he spent in getting existing obligations extended or refinanced. Although there was no showing as to *which* days he was out of the shop, he said that he arrived at the 81 day figure from records he kept in the barber shop. He was not asked, either on direct or cross examination, to produce those records.

In September, 1964, Mills filed a suit against Basden and Eppler. From comments at the trial and in the briefs, it was apparently in the nature of a foreclosure action, with allegations that Basden held the Eppler notes and mortgages in trust for Mills. This suit was dismissed without prejudice in December, 1964, and in February, 1965, Mills and his wife filed the action for damages for fraud which led to the appeal now before this court. Sometime later Eppler obtained bank financing, paid Mills for his "equity" in the business, and paid Basden the amount due him to satisfy his mortgage liens. There was no settlement of this action for damages for fraud, however, and it came to trial in August, 1966.

The evidence above summarized was presented through documentary exhibits and the testimony of plaintiffs, Mr. and Mrs.

Mills, and their 18-year old son, who heard one of the conversations with Basden.

When plaintiffs rested, defendant produced two witnesses. One was a Mr. Mayhall, who testified that prior to the transaction with Eppler, Mills offered the property to him for $15,000. This was denied by Mills. The other was Mr. Eppler, who testified that at the original conference in Basden's office, it was specifically agreed by Mills that Basden was to collect his $12,000 under the payments outlined in the contract of sale before Mr. and Mrs. Mills would be paid for their equity. However, Eppler's credibility was attacked on cross examination by evidence of prior inconsistent statements.

On appeal, defendant first argues that the trial court erred in overruling his demurrer to plaintiff's evidence and in failing to direct a verdict, citing Scrivner v. Scrivner, 207 Okl. 225, 248 P.2d 1045, and Schow v. Guardtone, Inc., 18 Utah 2d 135, 417 P.2d 643, for the rule that "To render the nonperformance of a promise to be performed in the future, fraudulent, the promise must be accompanied by an intent not to perform". Defendant argues that there was no evidence of any promise by Basden accompanied by an intent not to perform, and it must be conceded that there is no direct evidence to that effect. However, the jury were entitled to consider the entire transaction, with all the pertinent facts and circumstances.

▆▆▆ In Schow v. Guardtone, Inc., supra, the Utah court considered all the facts and circumstances surrounding the signing of the four contracts there involved, both before and after the signing, and concluded that there was sufficient evidence considering the circumstances, to sustain the jury verdict for plaintiffs which found that fraud had been practiced upon them. We think the same is true here. There was evidence that in preliminary conversations with Mills in the barber shop, Eppler told him he would have to borrow most of the money (he had only about $1200 in cash). In the later conference in Bas-

den's office which resulted in the drafting and signing of the contract of sale, Mills testified that Eppler told Basden " * * * what he wanted to do, which was the same story he told me in the barber shop". When all the facts with regard to what Eppler had in the way of security were laid before him, Basden said " * * * I can handle it". Under these circumstances the jury could legitimately believe that what Basden meant he could "handle" was a loan to Eppler of the entire purchase price so he could pay Mills for his equity. This conclusion is supported by Mills' testimony that on the day following the signing of the instruments Basden told him "I know that you thought * * * that I was going to pay you off."

Basden then drafted a contract of sale calling for monthly payments over a period of ten years, and referring to mortgages but not identifying the mortgagee. Since the purpose in coming to Basden in the first place had been to enable Eppler to borrow money with which to make the purchase, the payment provisions in the contract were consistent with the view that Basden contemplated drawing notes and mortgages covering the entire $25,000 and lending Eppler the money with which to pay Mills. During the four day interval between the signing of the contract of sale and the completion of the transaction by the execution of the notes and mortgages, Basden told Mills, with regard to Mrs. Eppler, that "If we don't get her name on the mortgages *I won't be able to pay you your money* * * *" (emphasis supplied). Testimony as to this statement by Basden is uncontradicted.

Basden then, on Feb. 24, 1964, presented to the Epplers for their signatures notes and mortgages calling for the payment by the Epplers *to Basden* of the *entire purchase price*—$25,000. This action was consistent with Mills' belief, pursuant to Basden's promise that he would "handle it", that Basden intended to lend Eppler the money with which to pay Mills. At the same time Basden presented the "Agreement" for the

signatures of Mills and his wife. Mills' testimony that he signed it without reading it, thinking it was the "possession agreement", was uncontradicted. Also, the testimony of Mrs. Mills that when she objected to signing the "Agreement" Basden told her that "When we get all the papers signed, you are going to get your money" is uncontradicted. Also, the testimony that the day after the signing of the mortgages, Basden told Mills that "I know that you thought when you and the man were making that deal up here, that I was going to pay you off" is uncontradicted.

After a careful examination of the record before us, we hold that the court did not err in overruling defendant's demurrer to plaintiff's evidence and in refusing to direct a verdict.

▇▇▇ In his second proposition, defendant argues that the court erred in permitting the introduction of evidence in violation of the parol evidence rule, citing Lone Star Gas Co. v. Oakman, Okl., 283 P.2d 810, and similar cases construing 15 O.S.1961, Sec. 137. Under that section of the statute, as shown in the Lone Star case, parole evidence to vary the terms of a written instrument is admissible where fraud is proved by clear, cogent and convincing evidence. In view of the evidence in this case, much of which was uncontradicted, we hold that the court did not err in this regard.

▇▇▇ In his fourth proposition, defendant argues that plaintiffs, by their conduct, waived the right to sue for damages for fraud, or are estopped in that connection. However, both waiver and estoppel are affirmative defenses which must be pleaded; 28 Am.Jur.2d Estoppel and Waiver, Sections 135 and 168; Blakeney v. Home Owners' Loan Corp., 192 Okl. 158, 135 P.2d 339; American Cas. Co. v. Oliver, 205 Okl. 639, 239 P.2d 1012. There was no plea of waiver or estoppel in this case, and the facts urged in the brief as constituting a waiver or estoppel do not appear upon the face of the pleadings within the meaning of the rule stated in Dillard v. Ceaser, 206

Okl. 304, 243 P.2d 356. Furthermore, we are unable to identify this complaint or proposition in defendant's motion for new trial or in petition in error.

▇▇▇ In defendant's remaining propositions, he complains of various instructions given by the court, and of the submission of various issues to the jury in such instructions. As we have noted, defendant did not object to any instruction given, and did not present any proposed instruction for the court's consideration. It is well settled that under such circumstances this court will review the instructions only to determine whether they are free of fundamental error; Shayler v. West, 199 Okl. 386, 185 P.2d 957. Nevertheless, because the judgment in this case includes a substantial amount for punitive damages, we have given careful attention to these propositions, and we cannot say that fundamental or prejudicial error was committed. Although the evidence with regard to actual damages (81 days lost from the barber shop at $10.50 per day; interest paid by Mills on renewed or extended obligations between the date of the sale and the time Mills was actually paid) was not as definite as it might have been, it was uncontradicted. We hold that it was sufficient to support an award of actual damages.

We have also given careful consideration to defendant's argument that he was prejudiced because the trial court submitted to the jury, under pertinent instructions, plaintiff's alleged claim for damages in the amount of $10,000 for mental "pain and suffering". At the hearing on the motion for new trial, the trial court ordered this amount of the actual damages remitted as a condition for the overruling of the motion, and it is not included in the judgment now before us. Defendant argues, however, that "the damage was already done", citing the substantial amount awarded for punitive damages.

▇▇▇ Although we do not necessarily agree that the submission of the claim for pain and suffering was responsible, we do feel that the award of $25,000 for punitive

damages is excessive. It is well settled that punitive or exemplary damages are awarded " * * * for the sake of example and by way of punishing the defendant", 23 O.S.1961, Sec. 9, and not for the purpose of enriching the plaintiff. In connection with their prayer for punitive damages, plaintiffs could properly have offered evidence as to defendant's financial worth. Smith v. Autry, 69 Okl. 28, 169 P. 623; Fawcett Publications, Inc. v. Morris, Okl., 377 P.2d 42. Such information would have been helpful to the jury, and to this court on review, in determining how large the award for punitive damages would need to be in order actually to constitute "punishment" to defendant.

█ It is also well settled that the amount of an award for punitive damages is peculiarly a matter for jury determination, and that such determination will not be interfered with lightly upon a claim of excessiveness. Fife v. Adair, 173 Okl. 234, 47 P.2d 145; Oller v. Hicks, Okl., 441 P.2d 356. A jury award of punitive damages will not be held excessive " * * * unless it appears to be grossly so or the result of passion, prejudice or improper sympathy", Cities Service Oil Co. v. Merritt, Okl., 332 P.2d 677.

In view of these established principles, it is obvious that no rule of thumb may be formulated to apply in all cases in determining whether an award of punitive damages is excessive, and we do not do so here. We do observe, however, that even after the remittitur ordered by the trial court, the award for punitive damages in this case was over twenty-one times as large as the award for actual damages. We are unable to approve such a disproportionately large amount in the absence of any showing in the record before us as to the financial worth of defendant.

█ The judgment of the trial court is affirmed upon condition that, within ten days after the mandate is received by the trial court, the plaintiffs file a remittitur of $15,000, leaving judgment for plaintiffs in the amounts of $1186.42 for actual

damages and $10,000 for punitive damages. If at the end of said ten days such remittitur has not been filed, the judgment will stand reversed and the cause remanded to the trial court with directions to grant defendant a new trial.

All Justices concur.