Sarah M. SPAETH, Appellee,

v.

UNION OIL COMPANY OF CALIFORNIA, a corporation, Appellant.

No. 81-1752.

United States Court of Appeals, Tenth Circuit.

June 24, 1983.

Robert J. Emery, Oklahoma City, Okl. (James M. Gaitis of Emery, McCandless, Gaitis, Bruehl & Gerstandt, and Harry H. Selph, II, of Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, Okl., with him on brief), for appellee.

H.B. Watson, Jr., Oklahoma City, Okl. (Richard K. Books of Watson, McKenzie & Moricoli, Oklahoma City, Okl., with him on briefs), for appellant.

Before McWILLIAMS, McKAY and BREITENSTEIN, Circuit Judges.

BREITENSTEIN, Circuit Judge.

This diversity action presents a claim by a lessor against a lessee for tortious breach of an Oklahoma oil and gas lease implied covenant to protect against drainage. After trial the jury found that the defendant had breached the lease and awarded both actual and punitive damages. Subsequently, the court awarded partial lease cancellation. The appeal of the lessee raises many issues of fact and law. We affirm the jury verdict that defendant breached the lease and the court decision for partial lease cancellation. We reverse the awards of actual and punitive damages.

The basic facts are not disputed. Plaintiff-appellee Spaeth owns an undivided one-half mineral interest in approximately 160 acres of the Northeast Quarter of Section 4. In 1956 her predecessor in title made an oil and gas lease of the land to defendant-appellant Union Oil Company of California. By order of December 28, 1965, the Oklahoma Corporation Commission, hereafter Commission, designated Section 4 as a single drilling and spacing unit for the Morrow common source of supply, the oil and gas bearing formation underlying the area. Union drilled what is known as the Schneider well on Section 4. Production from the well commenced in May, 1967.

Union has the following additional interests in the immediate area: (1) approximately one-half of the working interest in Section 3 (immediately to the east of Section 4); (2) one-fourth of the working interest in Section 9 (immediately to the south of Section 4); and (3) three-eighths of the working interest in Section 10 (immediately to the southeast of Section 4).

Sections 3, 9, and 10 are also single drilling and spacing units for the Morrow common source. Each contains one well. Union operates the well on Section 3. Amoco Production Company operates the wells on Sections 9 and 10.

On February 13, 1975, Ralph Harvey, president of Marlin Oil Company, filed an application with the Commission for permission to drill an additional well on Section 4. At the time neither Harvey nor Marlin had any interest in Section 4. Union appeared before the Commission's Trial Examiner and opposed Harvey's application. The Commission denied the application on June 11, 1975. Before filing the application, Harvey had corresponded with Union concerning the drilling of an additional well on Section 4 and Union had rejected his proposals.

Spaeth and other owners of mineral interests in Section 4, on January 29, 1976, filed an application with the Commission for authorization to drill another well on Section 4. Union appeared before the Commission and resisted the application. The Commission denied the application on June 22, 1976. Spaeth then appealed to the Oklahoma Supreme Court.

On October 25, 1976, counsel for Spaeth wrote Union that the wells in Sections 3, 9, and 10 were causing substantial drainage of gas from Section 4 which Union permitted by failing to drill another well and by opposing Spaeth's application for another well. The letter gave Union the option of drilling another well, releasing the lease within 90 days, or facing an action for lease cancellation.

The instant action was filed in state court on February 20, 1979, and removed to federal court on diversity grounds. Before the case went to trial the Oklahoma Supreme Court reversed the Commission's denial of the Spaeth application. *Spaeth v. Corporation Commission,* Okl., 597 P.2d 320. Union filed a petition for rehearing which was denied. Pursuant to the court's mandate, the Commission, on December 20, 1979, authorized another well on Section 4. Union then expressed willingness to drill an additional well if Spaeth abandoned her cancellation claim. She refused to do so. The case then proceeded to a simultaneous trial to a jury on the questions of liability and damage and to the court on the question of lease cancellation. The jury found Union liable and awarded Spaeth $22,807 in actual damages and three million dollars in punitive damages. The court ordered lease cancellation except as to the limited right to produce and market gas and condensate

from the Schneider well on Section 4. R. 296.

Plaintiff Spaeth claims fraudulent drainage by the three wells in adjoining sections. Union is the operator of one of the wells and has a substantial interest in the other two. The Spaeth well is towards the edge of the formation with less pressure than the three other wells which are located near the top of the formation. The well on the Spaeth section reaches a tighter and less productive sand than that found under the other three wells. Two witnesses for Spaeth testified as to drainage. Harvey, Tr. 170, 175–181; and Flesher, Tr. 76–80. Two witnesses for Union conceded the fact of drainage. Hughes, Tr. 278–282; and Cunningham, Tr. 431–432, 447. The fact of substantial drainage is supported by the evidence.

Oklahoma law recognizes that, absent an express provision, an oil and gas lease contains an implied covenant to protect against drainage. The prudent operator rule is usually the yardstick to determine compliance with this covenant. *Sunray Mid-Continent Oil Co. v. McDaniel,* Okl., 361 P.2d 683, 685. Union asserts that the prudent operator rule does not apply because the spacing order prevented it from drilling another well on Section 4. This argument was specifically rejected by the Oklahoma Supreme Court in *Corporation Commission v. Union Oil Company of California,* Okl., 591 P.2d 711, 715, which, after quoting 52 O.S. 1971 § 87.1(c) said:

"... the statute allows the Commission to authorize the drilling of an additional well within a drilling or spacing unit upon proof that the additional well or modification of the previous order will assist in preventing waste or the protection of correlative rights of persons interested in the common source of supply."

Although Oklahoma does not appear to have determined whether, under a protection covenant, a lessee is required to seek administrative relief from a spacing and drilling order, we have held that the acceptance of an argument similar to that of Union is to give a "license to drain gas," and "[i]t would be grossly inequitable to confer such windfalls." *Cook v. El Paso Natural Gas Co.,* 10 Cir., 560 F.2d 978, 982. Union had a duty, which it could not ignore, to seek administrative relief. See *Sinclair Oil & Gas Co. v. Bishop,* Okl., 441 P.2d 436, 447.

Union opposed both Spaeth's application to the Commission for permission to drill another well on Section 4 and Spaeth's appeal from the Commission order to the Oklahoma Supreme Court. Union justifies its conduct by saying that it relied on the advice of its experts. The argument has no merit. In its decision reversing the Commission, the Oklahoma Supreme Court pointed out that before the Commission Spaeth offered evidence of an expert supported by technical data and that Union offered no expert testimony. *Spaeth v. Corporation Commission,* supra, 597 P.2d at 322. We find nothing in the record to sustain Union's claim of good faith reliance on its experts. The reasonable inferences are all to the contrary.

Union argues that the filing of this suit suspended any duties which it owed under the protection covenant. A demand for performance of an implied covenant is prerequisite to an action for breach of that covenant. *Vincent v. Tidewater Oil Programs, Inc.,* Okl., 620 P.2d 910, 916. Spaeth made her demand on October 25, 1976. That demand did not suspend any duty owed under the lease. The filing of suit to cancel or terminate a lease excuses the lessee's performance of an implied covenant. *Hoyt v. Continental Oil Co.,* Okl., 606 P.2d 560, 562. That suspension has no effect on the rights of the lessor which have accrued when suit is filed.

Before this suit was filed, gas produced from Section 4 was sold to Oklahoma Natural Gas Co. at 21.2 cents per MCF, thousand cubic feet. After the suit was filed, Oklahoma Natural Gas agreed to pay $1.03 per MCF for gas produced from a second well on Section 4. Union says that, until the increase, the drilling of a second well was not potentially profitable and,

hence, the well would not have been drilled by a prudent operator.

The evidence on profitability is conflicting. Spaeth's witness Harvey testified that a prudent operator would have drilled a well as early as 1973 and realized a profit. Tr. 174–175. Defense witness Eggebretcht calculated the return on investment would be only 3.3% on a well drilled in 1976. Tr. 347–348. Defense witness Cunningham said that a prudent operator would not have drilled in 1976 because of an unfavorable profit to investment ratio. Tr. 390. On rebuttal Harvey attacked the defense figures as omitting the value of condensate to be recovered and overestimating the costs of drilling. Tr. 474–480. He presented his analysis of the economic aspects of drilling another well in 1976 and estimated the profit to investment ratio to be five to one. Tr. 483. The jury resolved the evidentiary conflict in favor of Spaeth. Its verdict has substantial evidentiary support.

■ The issue of lease cancellation was submitted to, and considered by, the court as a matter of law. The court ordered cancellation of the Section 4 lease "save and except that portion of the leasehold which has been properly developed through the Schneider 1–4 well." R. 296. The court's findings of fact are consistent with the jury verdict and are not clearly erroneous. Union argues that lease cancellation, after an award of both actual and punitive damages, is an impermissible double recovery. We do not agree. The court held, R. 295, that the "actions and inactions of Union Oil Company were in breach and disregard of the duties it owed to Sarah M. Spaeth to protect her mineral estate from drainage and to fully develop that mineral estate." The court also characterized Union's conduct toward Spaeth as "either a willful, fraudulent or grossly negligent breach of the duty owed to her." R. 296. In *Barnes v. Mack Oil Co.,* Okl., 376 P.2d 279, a trial court judgment awarding drainage damage and partial cancellation was affirmed. As to cancellation for breach of an implied covenant, the court said, *Id.* at 281, that it "must look to the facts and circumstances

of each case." The trial court examined the facts and circumstances in the case at bar. We agree with it that the equities warrant partial cancellation.

■ Union objects to the court's instructions on various grounds, most of which relate to the application of the prudent operator rule. The instructions are consistent with the views herein stated with regard to that rule. We are not impressed with the Union argument that the instructions shifted the burden of proof. We do not read the instructions as having that effect.

■ The jury awarded $22,807.00 in actual damages. We find nothing in the record to sustain that award. Flesher, a witness for the plaintiff, testified that drainage until January 1, 1981, was 7.2 billion cubic feet of gas, Tr. 78; that the value of Spaeth's lost royalty on gas was $16,320.00, Tr. 81; and that her value on lost condensate royalty was $1,132.00, Id., for a total of $17,452.00. The estimates of other witnesses were even lower. See Harvey, Tr. 170, 519–520; Hughes, Tr. 280; Eggebretcht, Tr. 351–352; and Cunningham, Tr. 431–432, 447. We are not impressed with Spaeth's efforts to sustain the jury award of actual damages. Viewing the record in the light most favorable to the plaintiff, the prevailing party, the recovery of actual damages is limited to $17,452.

The jury awarded punitive damages in the amount of three million dollars. Union says that punitive damages are improper and that the award is excessive. The applicable Oklahoma statute says that in any action for breach of an obligation not arising from contract where the defendant is guilty of fraud or oppression, actual or presumed, the jury in addition to actual damages "may give damages for the sake of example, and by way of punishing the defendant." Okl.Stat.Ann. tit. 23, § 9 (1951).

■ Union argues that the case is one for breach of contract and punitive damages are not permitted under Oklahoma law. We do not agree. Plaintiff complained of both failure to drill and tortious

drainage. The court instructed the jury that if it found that Union's act or omission "was maliciously, or wantonly, or oppressively done," punitive damages may be awarded. Tr. 559. The court then defined "maliciously," "wantonly," and "oppressively." Id. at 559–560. In *Misco Leasing, Inc. v. Keller,* 10 Cir., 490 F.2d 545, 549, we considered the Oklahoma law on punitive damages and said:

"... when there is a reckless and wanton disregard of another's rights, malice and evil intent may be inferred and punitive damages may be awarded."

The evidence shows a reckless and wanton disregard by Union of Spaeth's rights and sustains a reasonable inference of malice and evil intent. The court properly submitted the punitive damage issue to the jury. The question is whether the award is excessive. If the award resulted from passion and prejudice, a new trial on the amount of punitive damages would be in order. Essentially the dispute was between two oil companies. The plaintiff was assisted and financed by Marlin Oil Company and it was entitled to participate in any damage award. Tr. 203–205. The trial was a contest between experts and was completely devoid of emotional overtones.

Oklahoma permits evidence of defendant's net worth to be considered in determining punitive damages. *Smith v. United States Gypsum Co.,* Okl., 612 P.2d 251, 255, and *Basden v. Mills,* Okl., 472 P.2d 889, 896. In applying Oklahoma law we have held that "exemplary [punitive] damages must bear some relation to the injuries inflicted and the cause thereof." *Garland Coal & Mining Company v. Few,* 10 Cir., 267 F.2d 785, 791.

Under the controlling Oklahoma statute, Okla.Stat.Ann. tit. 23, § 9, punitive damages may be awarded for the sake of example or by way of punishment. The deterrent or punishment value of a punitive award varies from case to case. Cf. *Cities Service Oil Co. v. Merritt,* Okl., 332 P.2d 677 with *Jones v. Lennington,* Okl.Ct.App., 629 P.2d 805. The applicable criteria are (1) the amount needed to punish, (2) in the circum-

stances presented. Id. at 807. The Supreme Court has characterized a punitive award as a "discretionary moral judgment." *Smith v. Wade,* —— U.S. ——, 103 S.Ct. 1625, 1638, 75 L.Ed.2d 632. Absent an award which shocks the judicial conscience, a jury's determination is inviolate. *Metcalfe v. Atchison, Topeka & Santa Fe Railway Co.,* 10 Cir., 491 F.2d 892, 898, and *Oller v. Hicks,* Okl., 441 P.2d 356, 360.

On the record presented the punitive award shocks our collective judicial conscience. When the jury returned its verdict, it did not know that the court would later cancel the lease except for the one well Union was operating. Spaeth may now lease to another oil company. The loss of lease is a circumstance for consideration in evaluating the punitive award. In denying the motion for a new trial, so far as punitive damages are concerned, the court abused its discretion by not taking into account all the circumstances presented.

We have considered *Malandris v. Merrill Lynch, Pierce, Fenner & Smith,* 10 Cir., 703 F.2d 1152, and conclude that it is inapposite because of factual differences and because it applies Colorado law whereas the instant case is governed by Oklahoma law.

In the exercise of our power under 28 U.S.C. § 2106, we remand the case to the district court with directions (1) to enter a judgment for the plaintiff and against the defendant in the amount of $17,542 for actual damages, (2) to set aside and vacate the award of punitive damages, (3) to order a remittitur of a substantial amount in punitive damages with due consideration to the amount needed to punish the defendant in the particular circumstances presented, and (4) if the plaintiff does not accept the remittitur, to hold a jury trial solely on the amount of punitive damages.

Reversed in part and affirmed in part. The costs in this court shall be equally divided.