James C. BUZZARD and Martha N. Buzzard, Individually and as Parents and Next of Kin of Troy Dean Buzzard, Deceased, Appellees,

v.

FARMERS INSURANCE COMPANY, INC., and Farmers Insurance Exchange d/b/a Farmers Insurance Group of Companies, Appellants.

No. 69344.

Supreme Court of Oklahoma.

Dec. 3, 1991.

Rehearing Denied Feb. 19, 1992.

John F. Percival, Roger L. Heath, Lana K. Cohlmia, Mark E. Truex, Culp, Heath, Sushnik, Percival & Percival, Oklahoma City, for appellants.

Clifton D. Naifeh, Naifeh & Woska, Oklahoma City, for appellees.

**SUMMERS, Justice:**

Farmers Insurance Company contracted with the plaintiffs to provide coverage for injuries caused by underinsured motorists as defined in the Oklahoma Insurance Code. It appeals a large jury verdict rendered against it for actual and punitive damages based on the company's bad-faith failure to honor its contract. The company argues that it had a reasonable basis in fact and in law to delay or deny payment of the claim. It also challenges on appeal certain rulings of the trial court relating to the evidence and jury instructions. Finally it attacks the award of punitive damages as unsupported by the evidence, and on constitutional grounds. Upon review we affirm, subject to plaintiff's application for remittitur.

## I. FACTS

On August 19, 1982, eighteen-year-old Troy Buzzard was killed in an automobile accident involving his Toyota truck and a truck owned by the City of Norman. The city truck, driven by a city employee, attempted to cross a highway. Troy, traveling eastbound on the highway, collided with it. The gas tank exploded and Troy was burned to death. The passengers in the city truck were also severely burned.

The report of the investigating police officer revealed the city truck was severely overloaded, weighing more than one ton over the weight limit. The city truck failed to yield in crossing the highway and was unable to maneuver quickly because of its size and weight. The officer estimated that Troy was traveling at a speed of between 65 and 75 miles per hour before the collision, and between 45 and 55 miles per hour at impact. At impact, the city truck was blocking both eastbound lanes of the highway.

The next day the incident was reported by James and Martha Buzzard, the parents of Troy, to Farmers Insurance Company. There is no dispute that a policy issued by Farmers insuring the vehicle was in effect at the time of the accident. Uninsured motorist (UM) coverage under the policy was $10,000.00. It is also undisputed that the City's liability policy provided coverage up to $50,000.00 per claimant and $300,-000.00 per accident. Home Insurance Company was the insurer of the City.

The Buzzards retained counsel to represent them, and counsel made demand for payment under the UM portion of the Farmers' policy on September 2, 1982. According to the Farmers' file made by the claims adjuster, no investigation was made into the cause of the accident or the liability limits of the City, and no settlement was

offered. Instead, the claims adjuster repeatedly told Buzzard that Farmers would not offer any UM settlement until the liability limits of the City had first been exhausted. The Buzzards' attorney, Phillip DeVilliers, told the adjuster that the policy liability limits of the City was $50,000.00, and that in light of the accident, his clients' claim far exceeded this amount. Nevertheless, Farmers refused to make any settlement offer, relying on the general industry policy that liability insurance of the tortfeasor must first be exhausted.

This process continued for over seven months. During this time DeVilliers repeatedly contacted the claims adjuster regarding payment of the UM claim. During this delay, Farmers did not conduct any investigation into the accident or into the liability limits of the City. In March, 1983, DeVilliers informed Farmers that settlement with the City was imminent. Farmers, in reply, wrote DeVilliers that if the Buzzards settled with the City and executed releases, Farmers would deny UM benefits because the insurer's subrogation rights would have been extinguished. The Buzzards then settled with the City for $50,500.00, and signed a covenant not to sue. Once informed of the settlement, the claims adjuster closed the file without payment, and destroyed his personal notes on the case.

The Buzzards, through their attorney, again requested payment under the UM policy. DeVilliers informed the adjuster that the delay in payment was causing substantial family strife. The adjuster answered by refusing payment based on the issuance of the covenant not to sue given by Buzzards to the City of Norman. The record reveals a memorandum written by Farmers' claim manager in which he acknowledged the family strife and noted that Mrs. Buzzard disagreed with her husband's pursuit of the claim, the intimation being that the Buzzards might drop the UM claim because of the intra-marital conflict.

In 1985, the Buzzards filed suit, alleging bad-faith denial of payment under the UM policy. Shortly before the suit was filed, but after the claim had been denied, Farmers began an investigation into the accident. At trial, Farmers alleged the claim was denied not only because of Buzzards' settlement with the City, but also because of the negligence of Troy Buzzard, the deceased. Farmers asserted that both Troy and the driver of the vehicle were fifty percent negligent. No mention of this comparative negligence theory as a basis for denial of the claim appeared in Farmers' file until after the date of the denial.

At trial extensive evidence regarding the circumstances surrounding the accident and the following denial of the claim by Farmers was presented to the jury. The jury returned a verdict in favor of the plaintiffs, specifically finding that the City was 73% negligent and that Troy was 27% negligent. They found that actual damages were $750,000.00, reduced by Troy's negligence to $540,000.00, but limited by the insurance policy to $10,000.00. The jury awarded actual damages for bad-faith breach of contract in the amount of $200,000.00, and $2,000,000.00 in punitive damages. Thus, the total damages awarded were $2,210,000.00. From this, Farmers appealed. The Court of Appeals, Division I, affirmed the verdict. Certiorari was granted on March 12, 1990, and we affirm, subject to conditions stated in this opinion.

## II. THE TORT OF BAD–FAITH BREACH OF CONTRACT

Farmers argues that there was insufficient evidence to support a finding of bad faith. It asserts that three reasonable defenses existed for denying Buzzard's claim: (1) contributory negligence on the part of Troy Buzzard, (2) settlement was not due until the liability limits of the tortfeasor had been exhausted, and (3) abrogation of the insurer's right of subrogation. We will address each of these questions separately.

■ We first recognized the tort of bad-faith breach of contact in *Christian v. American Home Assurance Co.*, 577 P.2d 899 (Okla.1977). We held that the insurer is under a legal duty to act in good faith when dealing with its insured. The insurer's duty includes, but is not limited to, the

duty not to unreasonably withhold payment of claims. *Christian*, 577 P.2d at 903. The special relationship between the insurer and its insured gives rise to such a duty, especially in light of the quasi-public nature of the insurance industry and the unequal bargaining power of the parties. *Id.* at 902. Of particular importance is the delicate position of the insured after a loss is incurred:

> The very risks insured against presuppose that if and when a claim is made, the insured will be disabled and in strait financial circumstances and, therefore, particularly vulnerable to oppressive tactics on the part of an economically powerful entity. *Id.* at 902, *quoting Fletcher v. Western Nat'l Life Ins.*, 10 Cal. App.3d 376, 89 Cal.Rptr. 78 (1970).

In *McCorkle v. Great Atl. Ins.*, 637 P.2d 583, 588 (Okla.1981), we held that this duty of good faith to one's own insured extended to all types of insurance companies. In *Rodgers v. Tecumseh Bank*, 756 P.2d 1223, 1226 (Okla.1988), we refused to extend the duty to commercial loan agreements. This refusal was based on the absence of the policy considerations present in an insurance contract. In pursuing a claim, the plaintiff carries the burden of proof and must plead the elements of this intentional tort, the essence of the tort being the unreasonable bad-faith conduct of the insurer. *McCorkle* 637 P.2d at 587; *Manis v. Hartford Fire Ins. Co.*, 681 P.2d 760, 761 (Okla. 1984).

■ The tort of bad faith does not foreclose the insurer's right to deny a claim. An insurer clearly has the right to resist payment and litigate any claim to which the insurer has a *reasonable defense.* "Resort to a judicial forum is not *per se* bad faith or unfair dealing on the part of the insurer regardless of the outcome of the suit." *Manis*, 681 P.2d at 761. In such circumstances the insurer does not risk a tortious breach of contract.

■ However, a claim must be paid promptly unless the insurer has a reasonable belief that the claim is legally or factually insufficient. The decisive question is whether the insurer had a "good faith belief, *at the time its performance was requested,* that it had justifiable reason for withholding payment under the policy." *Buzzard v. McDanel*, 736 P.2d 157, 159 (Okla.1987). To determine the validity of the claim, the insurer must conduct an investigation reasonably appropriate under the circumstances. The knowledge and belief of the insurer during the time period the claim is being reviewed is the focus of a bad-faith claim. *Id.* Bearing these principles in mind, we proceed to Farmers' first argument.

## A. THE COMPARATIVE NEGLIGENCE OF TROY BUZZARD

■ At trial Farmers advanced the defense that the claim was denied because Farmers believed Troy was primarily at fault. The speed of Troy's vehicle was litigated by both parties throughout the trial. Farmers' accident reconstructionist explained that the speed of Troy's vehicle was a contributory factor in the accident, and the jury so found.

However, as the Buzzards point out, nowhere in Farmers' file was there any statement that the claim was denied because of the excessive speed, or that the claim was delayed until further investigation could be conducted to determine the primary cause of the accident. In fact, one letter written by the claims adjuster stated that the primary cause of the accident was the city truck. Prior to Buzzard's settlement with the City, the only reason ever documented for denial or delay of the claim was Farmers' intention to wait until the liability carrier, Home, settled with the insureds. The intention to await settlement from the City's liability insurer supports Buzzard's assertion that Farmers believed the City, rather than Troy, was primarily responsible for the accident.

Where there is any competent evidence or reasonable inference therefrom to sustain the jury's verdict, the judgment will be sustained on appeal unless shown to be contrary to law. *Silk v. Phillips Petroleum Co.*, 760 P.2d 174, 176 (Okla.1988). Here, the jury was aware of Troy's speed

at the time of the accident. However, there was evidence that during the relevant time period, this defense was neither internally noted by Farmers nor communicated to plaintiffs as a reason for delay or denial of the claim. Accordingly, we find the jury's verdict to be supported in this respect.

### B. EXHAUSTION OF LIABILITY LIMITS AS A PREREQUISITE FOR BENEFITS

Farmers asserts that delay of payment was legally justified because payment by an underinsured motorist carrier was not required until the liability policy limits on the city vehicle were exhausted. Relying on *Everaard v. Hartford Accident & Indem. Co.*, 842 F.2d 1186 (10th Cir.1988), the Buzzards disagree, arguing that because the claim clearly exceeded the available limit of liability insurance, Farmers was obliged to pay the UM benefits. We have never addressed the question of the requirement of exhaustion of other policy limits as a condition precedent to recovery of *underinsured motorist benefits*. *See Niemeyer v. U.S. Fidelity & Guar. Co.*, 789 P.2d 1318, 1321 (Okla.1990).

### 1. UNDERINSURED V. UNINSURED

▮ Title 36 O.S.1979 § 3636 requires that uninsured motorist coverage be offered in every policy insuring a vehicle unless it is waived by the insured. Specifically, Section 3636(B) states "this section shall provide coverage therein or supplemental thereto for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles...." Subparagraph (C) continues by including within the definition of "uninsured motor vehicle" a vehicle which is underinsured. Thus, the coverage provided under Section 3636 applies in the situation where the tortfeasor is without insurance or where the tortfeasor has insufficient insurance to satisfy the claim of the insured.

Both uninsured and underinsured coverage are first-party coverage intended to protect the insured from loss incurred because of a third-party tortfeasor. *See Uptegraft v. Home Ins. Co.*, 662 P.2d 681, 684 (Okla.1983). Coverage is primary when "under the terms of the policy, the insurer is liable without regard to any other insurance coverage available." *Equity Mut. Ins. Co. v. Spring Valley Wholesale Nursery*, 747 P.2d 947, 954 (Okla.1987). Coverage is secondary or excess when "under the terms of the policy, the insurer is liable for a loss only after any primary coverage—*other insurance*—has been exhausted." *Id.* (Emphasis in original)

It is common for the underinsurance policy itself to contain a clause which requires exhaustion of all available liability insurance, making it secondary or excess coverage. *See* Widiss, *Uninsured and Underinsured Motorist Insurance*, §§ 44.1 (2d Ed.1987). Underinsured motorist carriers often state in the policy that such insurance is only available "after the limits of liability under any applicable bodily injury liability bonds or policies have been exhausted by payments of judgments or settlements." *See* Widiss, at 124.

For example, in *Hibbs v. Farmers Ins. Co.*, 725 P.2d 1232, 1233 (Okla.1986), we upheld an "exhaustion of policy limits clause." In *Hibbs*, the insured settled with the primary UM carrier for less than policy limits, and then attempted to recover from the secondary UM carrier. The secondary carrier refused payment, relying on a clause in the policy that liability policy limits be exhausted before the secondary carrier became obligated to pay. We upheld the validity of this clause, stating that the effect of the clause was to make the secondary carrier merely an "excess" carrier.

Thus, in such policies, the underinsurance coverage would clearly be "excess" insurance. However, Farmers does not assert that such a provision exists in the present case, nor do we find one in the policy. Hence, if we are to hold that the Farmers' policy is "excess" insurance, and thus payable only after exhaustion of limits, we must do so on the basis of the

statute rather than on a particular clause in the policy.

Our section 3636(C) defines an underinsured vehicle as one which is insured, but "the liability limits of which are less than the amount of the claim" of the injured person. No specific requirements of the exhaustion of liability limits appears in the statute, nor is there any mention of exhaustion of limits as a condition precedent to recovery. Our statute makes it clear that the UM insurer is responsible only for the amount of the claim which exceeds that available from the liability carrier.

Buzzard relies on *Everaard v. Hartford Accident & Indem. Co.*, 842 F.2d at 1191, for the proposition that underinsurance is *not* excess insurance. There, the Court of Appeals for the Tenth Circuit considered, under Oklahoma law, the question of whether the insured must first exhaust the limits of a liability policy before the uninsured motorist carrier must pay. The case arose from an accident involving three vehicles, one of which was uninsured. It was stipulated that all three vehicles contributed to the injury. The uninsured motorist carrier urged that settlement was not required until the liability limits of the two insured vehicles had been exhausted.

Relying on Oklahoma case law including *Keel v. M.F.A. Ins. Co.*, 553 P.2d 153 (Okla. 1976), and *Uptegraft v. Home Ins. Co.*, 662 P.2d 681 (Okla.1983), the Tenth Circuit confirmed that uninsured motorist coverage is primary first-party coverage ·from the insurer to the policy holder. *Everaard*, 842 F.2d at 1190. Quoting language from *Keel*, the federal court explained that the insured may "file an action directly against his insurance company without joining the uninsured motorist as a party defendant and litigate all of the issues of liability and damages action." *Id.* The Tenth Circuit concluded that exhaustion of liability limits was not a condition precedent to payment by the uninsured motorist carrier.

Even should we agree with the Tenth Circuit that such is the law with regard to uninsured motorist benefits, *Everaard* does not address the question before us today. We must analyze *underinsured motorist coverage* rather than *uninsured motorist coverage* as to whether it is "excess".

The Minnesota Supreme Court addressed this issue in a factual scenario similar to ours. In *Schmidt v. Clothier*, 338 N.W.2d 256 (Minn.1983), two cases were consolidated to address the underinsurer's responsibility with regard to its insured when liability insurance was available. In one of the consolidated cases, the insured was injured in an automobile accident by an underinsured tortfeasor. The tortfeasor's insurer offered to settle for an amount below the policy limit. The insured notified his underinsurer of his intent to settle. The underinsurer refused to consent to the settlement and stated that the insured was not entitled to underinsurance benefits until the liability limits of the policy had been exhausted. On appeal, the insured urged that the underinsurer was responsible for the amount of damages sustained less the amount actually paid by the liability insurer. The underinsurer disputed this, claiming it was only responsible for that amount of damage over and above the liability limit, regardless of the amount that the insured actually accepted in settlement. The court, relying on the language of the statute requiring underinsurance, reached a result which balanced the interests of both the insured and the underinsurer:

> We hold that the underinsurer is liable only for the amount of damages suffered by the insured in excess of the liability limits of the defendant. *This holding permits the underinsurance claim to be processed immediately, without regard to any eventual settlement, for the underinsurer's liability depends not on the settlement but rather on the readily ascertainable liability limit of the defendant.* (Emphasis added)

In so holding, the court stated that the statutory language required coverage for that amount of damage uncompensated due to inadequate liability limits. However, the underinsurer was not responsible for the "gap" between the amount of settlement and the liability limit of the policy. By reaching this result, the insured is encour-

aged to obtain the best settlement possible, while also reaping the benefits of quick payment by the underinsurer.

We agree with this rationale. Section 3636(C) contemplates that underinsured motorist coverage will be available for that amount of injury or damage which exceeds the *liability limits* of the tortfeasor. Thus, Farmers' assertion that underinsurance is "excess" insurance is correct only in the sense that it becomes available only when the claim exceeds the amount of liability coverage. However, it is not "excess" as defined by *Equity Mutual*, because exhaustion of limits is not required as a condition precedent to recovery. Our statute is clear; underinsurance is available when "the liability limits ... are less than the amount of the claim ..." *See* 36 O.S.1981 § 3636(C).

■ If the claim exceeds the amount available under the liability policy, the underinsurer must take prompt action to determine what payment is due and may not delay the payment of benefits until exhaustion of liability limits. The underinsurer may not safely await settlement between the liability insurer and the insured. Instead, the insurer must go about the business of investigating and evaluating the claim. An insurer is readily equipped to make such a determination, and to assign a dollar value to the claim. Once this is accomplished, if the insurer determines that the claim does not exceed liability limits, and such valuation is supported by reasonable evidence, the underinsurer may delay payment. However, if the underinsurer does not conduct an investigation, or after investigation, determines that the likely worth of the claim exceeds the liability limits, prompt payment must be offered.

■ This Court, in *Keel*, contemplated the situation wherein an insured might wish to proceed directly against his insurer for uninsured motorist benefits without first adjudicating liability issues against the tortfeasor. We specifically held that such a course of action was permissible. *Keel*, 553 P.2d at 158; *see also Associated Indem. Corp. v. Cannon*, 536 P.2d 920, 922–23 (Okla.1975). The legislature defined the term "uninsured motor vehicle"

to expressly include "an insured motor vehicle, the liability limits of which are less than the amount of the claim...." 36 O.S.1981 § 3636(C). So the *Keel* rule would hold true in the case of underinsurance. The underinsurer is directly and primarily responsible to the insured for that amount of the claim which exceeds the liability limits of the tortfeasor's insurance. The insured may proceed against the underinsurer without first adjudicating the liability issues against the tortfeasor.

## 2. APPLICATION OF THIS RULE TO THE PRESENT CASE

■ The plaintiff's claim was for the death of their son in a fiery crash. The parties do not contest the fact that the claim exceeded the amount of liability coverage. Where, as here, the claim greatly exceeds the available liability coverage, we find no reason to require that payment be delayed while awaiting payment by the liability carrier. To do so would frustrate the very purpose of underinsured motorist coverage—protection of the insured from loss incurred at the hands of an underinsured motorist. *See Uptegraft*, 662 P.2d at 683–84.

We thus hold that requiring exhaustion of liability coverage was not a reasonable defense to the payment of the underinsured motorist benefits. Settlement by the City was not a prerequisite to settlement by Farmers. Requiring exhaustion of liability limits would completely dodge the intent of the legislature by allowing the insurer to delay its obligation until such a time as it could not be avoided. Our ruling furthers the purpose of underinsurance by providing quick payment for an insured's losses while also protecting the statutory rights of the insurer to be responsible only for that amount above the limits of liability. Regardless of whether the insured ever recovers from the tortfeasor, the insured may claim the benefits of underinsurance.

## C. THE ABROGATION OF FARMERS' SUBROGATION RIGHTS AS A BASIS FOR DENIAL

■ Farmers next asserts that it was correct in withholding payment of benefits

because Buzzard, by signing a covenant not to sue, cut off Farmers' subrogation rights. Buzzard disagrees, claiming that Farmers' tactics amounted to a waiver of subrogation rights, and the defense of estoppel should apply.[1]

Section 3636(E) makes allowance for the insurer's right of subrogation:

> ... [T]he insurer making such payment shall, to the extent thereof, be entitled to the proceeds of any settlement or judgment resulting for the exercise of any rights of recovery of such person against any person or organization legally responsible for the bodily injury for which such payment is made....

Farmers' reservation of subrogation rights also appeared in the policy.

In *Porter v. M.F.A. Mut. Ins. Co.*, 643 P.2d 302, 305 (Okla.1982), we held in a claim under an uninsured motorist policy that "as a general rule an insured who deprives insurer, by settlement and release, of its right of subrogation against the wrongdoer thereby provides insurer with a complete defense to an action of the policy." *Id.*

Later, in *Frey v. Independent Fire & Cas. Co.*, 698 P.2d 17, 21 (Okla.1985), we extended the *Porter* holding to include covenants not to sue. There, the insured signed a covenant not to sue the tortfeasor and attempted to recover under underinsured motorist provision of his policy. While we agreed that technically a difference existed between a release and a covenant not to sue, the result under the presented facts was the same: The insurer was precluded from recovering from the tortfeasor. Hence, the insurer had a defense to payment of the claim.

The *Frey* opinion acknowledged that a question remained as to "whether an insurer's prior denial of the insured's uninsured motorist coverage claim may operate to estop that insurer from later invoking the *Porter* doctrine's protection against destruction of its subrogation rights." *Id.* at

20. The question, however, has now been answered by our recent opinion in *Sexton v. Continental Casualty Co.*, 62 O.B.J. 2641. In response to a question certified from the U.S. District court, we ruled that a complete denial of coverage under an uninsured motorist policy estopped the company from later raising as a policy defense the fact that the uninsured claimant had settled with the tortfeasor and given a release which cut off subrogation rights. *Sexton* is consistent with such extrajurisdictional decisions as *Thiringer v. American Motors Ins. Co.*, 91 Wash.2d 215, 588 P.2d 191, 193 (1978), *Simmons v. South Car. Farm Bureau Mut. Ins.*, 301 S.C. 267, 391 S.E.2d 560, 562 (1990), and *National Mut. Ins. Co. v. Fincher*, 428 N.E.2d 1386, 1390 (Ind.Ct.App.1981).

Oklahoma has also previously recognized that in certain instances, an insurer is estopped from insisting on the forfeiture of benefits. *Old Surety Life Ins. Co. v. Miller*, 333 P.2d 504, 508 (Okla.1958). If the insurer's conduct leads an insured to believe that benefits will not be forfeited will estop the insurer from later denying benefits even though forfeiture "might be claimed under the express letter of the [insurance] contract." *Id.*

Here, Buzzard repeatedly requested payment from Farmers under the underinsured provisions of the policy. Farmers delayed payment awaiting the outcome of negotiations between the City of Norman and Buzzard, and specifically informed Buzzard that settlement by the City was a condition precedent to recovery. Written denial of payment by Farmers did not occur until after a settlement between the City and Buzzard had been reached and a covenant not to sue had been executed.

Buzzard contends that Farmers' unjustified delay pending negotiations was tantamount to denial, and that Farmers' refusal to make payment on the claim until a settlement with the city had been reached prevents any reliance on *Porter* or *Frey*.

---

1. Farmers claims that the Buzzards settled for less than the policy limits of the City, thus prejudicing any right of subrogation. Even if the Buzzards settled below liability limits, *see*

*Independent School Dist. I–29 v. Crawford*, 688 P.2d 1291, 1293 (Okla.1984), *Sexton v. Continental Casualty Co.*, infra, makes this argument irrelevant.

In other words, Buzzard asserts that Farmers is estopped from relying on *Porter* and *Frey* inasmuch as settlement and release was the only option available under Farmers' "exhaustion of liability limits" policy.

We have held Farmers was unreasonable in its delay of payment. As in *Thiringer, supra,* Farmers encouraged Buzzard to pursue his remedy against Home, and then refused payment based on this settlement. For this reason, and consistent with *Sexton, supra,* we hold that Farmers is estopped from relying on the rulings in *Porter* and *Frey* as a basis for denial. Farmers' course of action forced Buzzard to negotiate with the City's insurer. Acquiescence in Farmers' tactics would allow an insurer to avoid payments on any claim in which there was a possibility of settlement by a third party. Such a result would undermine the purpose behind underinsured motorist coverage by allowing insurers to deprive policy holders of the benefits for which premiums are paid. Under these circumstances, the holdings of *Porter* and *Frey* do not serve as a defense to payment on the policy.

### D. THE EVIDENTIARY RULING

At trial, an issue arose regarding a question asked of Farmers' accident reconstructionist. When Farmers asked him about his opinion as to the primary cause of the accident, plaintiffs' counsel objected on the basis that his opinion was not relevant because he had not evaluated the accident until *after* denial of the claim. The objection was sustained. On appeal Farmers asserts that the trial court erred. We disagree. The information relevant at trial was that upon which Farmers relied in refusing payment. The reconstructionist was not asked to evaluate the accident until *after the denial of the claim.* Thus, Farmers could not have relied on his opinion in denying the claim.

### E. JURY INSTRUCTIONS

Farmers urges that the Instructions 37 and 38 were misleading and unsupported by case law. Farmers complains that the former listed specific types of con-

duct which could be considered bad faith, such as delay of payment to await settlement with other insurer, and failure to investigate. The latter imposed a duty to settle if the parents' claim could have been reasonably foreseen by the Company to have exceeded the City's liability coverage of $50,000.00. At trial, Farmers submitted an instruction which contained a general statement of the law, rather than specific acts which could constitute bad faith.

As a general rule, the verdict will not be set aside if it appears that the instructions taken as a whole were not misleading or prejudicial to the complaining party. *Middlebrook v. Imler, Tenny & Kugler M.D.'s,* 713 P.2d 572, 585 (Okla.1985). It is the duty of the trial court to instruct the jury as to the decisive issues raised by the pleadings and evidence. *Timmons v. Royal Globe Ins. Co.,* 653 P.2d 907, 915 (Okl. 1982).

We have reviewed those instructions submitted by Farmers and those given by the trial court. In *David v. National Pioneer Ins. Co.,* 515 P.2d 580, 580 (Okla.Ct.App. 1973), the trial court gave fact-specific instructions in a bad-faith case. The appellate court upheld the instructions, stating that the complex nature of the tort required such specific instructions. Considered as a whole, we believe the instructions here sufficiently informed the jury of the issues in the case, and did not constitute grounds for reversal as are found in 20 O.S.1981 § 3001.1.

### III. THE AWARD OF PUNITIVE DAMAGES

The jury awarded two million dollars in punitive damages. Farmers argues that such a large punitive damage award was not warranted by the facts and that remittitur is in order. Before we address the question of remittitur, we seek to make clear the situations in which punitive damages are permissible in a bad-faith breach of contract suit.

In an action for tortious breach of contract, "consequential, and in a proper case, punitive damages may be sought."

*Christian,* 577 P.2d at 904. The availability of a punitive damage award in a bad-faith case is not automatic, but rather is governed by the standard applicable in other tort cases. The plaintiff must show that the defendant acted with oppression, malice, fraud or gross negligence or wantonness. Because such damages are awarded to punish the wrongdoer for the wrong committed upon society, Oklahoma does not require the amount of punitive damages to be in a particular ratio to the amount of actual damages.[2] *Timmons v. Royal Globe Ins. Co.,* 653 P.2d 907, 910 (Okla.1982). Instead, the focus is the harm caused to society by the defendant's wrongful actions. *Timmons,* 653 P.2d at 918, (*quoting Basden v. Mills,* 472 P.2d 889 (Okla.1970)). *Basden* does, however, allow the court to consider as a factor in determining the correctness of a punitive award the amount in actual controversy. *Id.* at 896.

In *Timmons,* the jury awarded three million dollars in punitive damages. The defendant insurer falsified a sworn statement, surreptitiously obtained confidential government records, misrepresented his identity, and discouraged the plaintiff from retaining legal counsel. We held that these facts "justified substantial punitive damages." *Id.*

> Measured by the wealth of the defendant, the amount awarded cannot be said to be legally erroneous considering the economic resources of the defendant, and the premise that a punitive damage verdict is peculiarly within the province of the jury and will not be casually interfered with on the grounds of passion or prejudice ... Upon review, such damages will not be held excessive unless it appears they are grossly so, or the result of passion, prejudice, or improper sympathy. *Id.*

However, we did order a remittitur of one million five hundred thousand dollars because "the combined effect [of the evi-

dence] ... influenced the jury so as to create an improper sympathetic response of a damage award larger than reason dictates to be necessary to deter such conduct...." *Id.* Farmers suggests that the facts in this case are much less egregious than those in *Timmons,* and argues that there is no evidence to support the award.

Farmers was notified of the claim the day after the accident but failed to conduct any investigation. The company delayed payment, stating on several occasions that the liability limits of the City were unknown, although Farmers had been told that the limit was $50,000.00 per claimant and that such was a matter of public record, Farmers did not attempt to verify this information and continued to use "lack of knowledge" as an excuse for delay. At trial, the attorney for the City testified that the policy limits were a matter of public record.

Farmers repeatedly refused to pay the claim, stating that it was standard procedure to await settlement by the tortfeasor. However, the employment and procedures manual distributed by Farmers to its adjusters stated the opposite, that settlement by Farmers was not to be delayed pending the settlement with the tortfeasor. Once settlement was reached, Farmers again refused payment because of the loss of its subrogation rights.

At trial, Farmers raised the issue of Troy's negligence, asserting that denial of the claim was based on Troy being the primary cause of the accident. However, nowhere in Farmers' file was comparative negligence mentioned as a reason for denial. In fact, even after investigation, there was no evidence to support the theory that Troy was the primary cause. Farmers' employees testified that at most, both the City and Troy were equally at fault. The procedures manual stated that if the insured was equally at fault rather than primarily at fault, payment on the policy

---

2. The present version of 23 O.S.Supp.1986 § 9 limits the amount of punitive damages to the amount of actual damages unless the trial court finds, on the record and out of the presence of the jury, that there is clear and convincing evidence of certain reprehensible conduct on the part of the defendant. The version of Section 9 in effect for this case provided no such limitation nor requirement.

should be made. Farmers' file indicated that it was the opinion of the claims adjuster that the City was primarily at fault.

A memorandum in the file also acknowledged that the delay was causing marital strife. The implication from the memo was that a continued delay would result in avoidance of payment of the claim. We believe the evidence supported the trial courts' decision to submit the question of punitive damages to the jury.

■ But we must view the circumstances within the context of the controversy between the Buzzards and Farmers. *Basden, supra,* at 896. Farmers' financial responsibility under its UM coverage amounted to only a slight part of the bereaved parents' monetary claim for the loss of their son. In the absence of bad faith this was a $10,000.00 obligation, nothing more. With bad faith having been found by the jury, the jury then proceeded to award the Buzzards actual damages for their emotional distress, as allowed by *Christian,* in the sum of $200,000.00. That is not an insignificant sum for the distress occasioned by delay in withholding a $10,-000.00 insurance payment over seven and a half months. No appeal is brought as to the quantum of these actual damages. However, we believe that the large award of punitive damages was likely a result of "an improper sympathetic response ... larger than reason dictates to be necessary to deter such conduct in this defendant and others similarly situated." *Timmons,* 653 P.2d at 919. We thus order that a remittitur by Buzzard of $1,600,000.00 be filed as a condition to the affirmance of this judgment for punitive damages.

■ Farmers next asserts that the award of punitive damages violates Federal constitutional provisions: the Eighth Amendment, the Contracts Clause and the Due Process Clause. As for the Eighth Amendment, the United States Supreme Court has recently held that the Excessive Fines Clause does not apply to punitive damage awards in cases between private parties. *Browning–Ferris Ind. v. Kelco*

*Disposal, Inc.,* 492 U.S. 257, 109 S.Ct. 2909, 2914, 106 L.Ed.2d 219 (1989).

■ The Contracts Clause and Due Process questions raised by Farmers center on the "lack of notice as to the appropriate standard of behavior." Farmers argues that an award of punitive damages is constitutionally defective because as an insurer, it was unable to plan ahead and calculate its premiums to allow for such an award under Oklahoma law. We disagree. Not only was the applicable law of punitive damages well known, Farmers was on notice that it had a duty to act in good faith toward its insured. *See Timmons,* 653 P.2d at 919; *Christian,* 577 P.2d at 902; 36 O.S.Supp.1979 3636(E).

## IV.  CONCLUSION

The opinion of the Court of Appeals is hereby vacated, and the judgment against Farmers is affirmed as to actual damages. As for the judgment for punitive damages, it is affirmed on condition that within 20 days after mandate issues herein the plaintiffs file in the District Court their remittitur of all punitive damages in excess of four hundred thousand dollars. Failing plaintiffs' election to file the aforementioned remittitur, the defendant is granted a new trial.

HODGES, V.C.J., LAVENDER and DOOLIN, JJ., and GARRETT, S.J. (Designated to take place of KAUGER, J., who recused), concur.

OPALA, Chief Justice, with whom ALMA WILSON, Justice, joins, concurring in part and dissenting in part.

I would affirm the trial court's judgment by holding that the underlying jury verdict is protected against court-ordered remittitur by Art. 2, § 19, Okla. Const., and by the provisions of 23 O.S.Supp.1986 § 9.

SIMMS and HARGRAVE, JJ., concurring in part, dissenting in part.