2000 OK 59

**Sammie Lou NEWPORT, individually and as personal representative of the Estate of Bobby D. Newport, deceased, Appellee,**

v.

**USAA, an unincorporated reciprocal insurance association, Appellant,**

v.

**Donavan Terry, Third–Party Defendant.**

No. 89,791.

Supreme Court of Oklahoma.

July 18, 2000.

As Corrected Aug. 1, 2000.

---

D. Lynn Babb, Haven Tobias, Pierce, Couch, Hendrickson, Baysinger & Green, L.L.P., Oklahoma City, Oklahoma, for Appellant.

Linda G. Alexander, Harris A. Phillips, Niemeyer, Alexander, Austin & Phillips, P.C., Oklahoma City, Oklahoma, for Appellant.

Michael G. Smith, D. Craig Shew, Laura J. Corbin, Smith, Shew, Scrivner & Corbin, P.C., Ada, Oklahoma, for Appellee.

Clyde A. Muchmore, Kevin D. Gordon, Crowe & Dunlevy, Oklahoma City, Oklahoma, for Amicus Curiae, State Farm Mutual Automobile Insurance Company.

Rex K. Travis, Oklahoma City, Oklahoma, for Amicus Curiae, Oklahoma Trial Lawyers Association.

HODGES, J.

¶ 1 This litigation arose from an automobile collision on icy roads between an insured of United Services Automobile Association (USAA) and an uninsured motorist. On Thanksgiving Day, November 23, 1993, Bob Newport was driving home in a sleet storm. The roads in Pontotoc County were visibly icy and slick. Donovan Terry, age 16, was traveling on an intersecting road. When Terry was unable to stop his car at a stop sign, he slid into the intersection and into the path of Mr. Newport's car. Terry's car was hit on the driver's side by the front of Mr. Newport's car. Once Terry was able to get out of his car on the passenger side, he exclaimed: "It wasn't my fault, I just couldn't stop. I tried to stop but just kept sliding."

¶ 2 Mr. Newport was taken by ambulance to a local hospital. There, he was determined to have suffered a cervical spinal cord injury. When his condition worsened, he was transferred to a hospital in Oklahoma City on December 6th He died there on January 3, 1994, at the age of 59. He left behind his wife, emancipated children, and a new business.

¶ 3 Mr. Newport and his wife Sammie, were insured with USAA. Terry was uninsured. The Newports maintained uninsured motorist (UM) coverage with stacked policy limits totaling 1.5 million dollars. The Newports elected no medical benefits coverage (med-pay). Their health plan with CHAMPUS specifically excluded payment of medical claims covered by a UM policy until the UM carrier "has issued its payment toward [the] medical bills."

¶ 4 Within a few days after the collision, one of USAA's senior claims examiners, John Folgate, was assigned to handle the Newport claim, the Newports hired a local attorney, Denver Davison, and USAA hired Lee Lancaster of General Adjustment Bureau in Ada, Oklahoma, to investigate the matter. In early December, 1993, USAA made the UM portion of the Newport's policy "available" for the payment of medical bills and other out of pocket expenses incurred as a result of the collision. In late December, USAA made a $5,000 advance to help cover additional living expenses while the Newport family was in Oklahoma City. But when the Newport's lawyer repeatedly requested payment

of specific medical expenses and funeral expenses, no payment was forthcoming and no explanation as to why was given.

¶ 5 In May, 1994, USAA set the value of the Newport claim at $750,000 to $900,000, taking into account its determination of liability as 80% on the part of Terry and 20% on the part of Mr. Newport. USAA hired an attorney and gave him $750,000 authority to negotiate a settlement. Three offers below that authority and one at that amount were made and were rejected by Mrs. Newport. This action was filed on October, 11, 1994.

¶ 6 Mrs. Newport brought this action against USAA to recover the policy limits under the UM provisions of the insurance contract. She also brought a "bad-faith" claim based upon USAA's failure to deal fairly and in good faith in the handling of the UM claim. USAA added Terry, the uninsured motorist, as a third-party defendant. He is not a party to this appeal. Trial of these claims resulted in a unanimous jury verdict of 1.5 million dollars on the claim for policy proceeds, 7.5 million dollars in actual damages on the claim for bad faith, and 7.5 million dollars in punitive damages.

¶ 7 USAA brought this appeal asserting several errors in the trial of this matter. The Court of Civil Appeals affirmed the trial court's refusal to give an "unavoidable accident" instruction but reversed the trial court's submission of the bad-faith claim to a jury. USAA's other assertions of error were not addressed by the Court of Civil Appeals. This Court granted certiorari review and now vacates in part the opinion of the Court of Civil Appeals and affirms in part and reverses in part the judgment of the trial court. The cause is remanded with directions. Additional facts appear with the analysis of the issues to which they relate.

## I. BAD FAITH

¶ 8 USAA argues that Ms. Newport failed to make out a *prima facie* case on her claim for breach of the duty of good faith and fair dealing. Thus, it urges error in the trial court's submission of the claim to a jury. USAA asserts it was entitled to judgment as a matter of law because its actions were understandable and reasonable under the circumstances.

¶ 9 An insurer has an "implied-in-law duty to act in good faith and deal fairly with the insured to ensure that the policy benefits are received." *Christian v. American Home Assurance Co.*, 577 P.2d 899, 901 (Okla.1977). The essence of a bad-faith action "is the insurer's unreasonable, bad-faith conduct, including the unjustified withholding of payment due under a policy." *McCorkle v. Great Atl. Ins. Co.*, 637 P.2d 583, 587 (Okla.1981).

¶ 10 The tort of bad faith does not foreclose the insurer's right to deny a claim, resist payment, or litigate any claim "to which the insurer has a legitimate defense." *Buzzard v. Farmers Ins. Co.*, 824 P.2d 1105, 1109 (Okla.1991) (*Buzzard II*). "A [bad faith] cause of action will not lie where there is a legitimate dispute." *Manis v. Hartford Fire Ins. Co.*, 681 P.2d 760, 762 (Okla.1984). However, when presented with a claim by its insured, an insurer "must conduct an investigation reasonably appropriate under the circumstances" and "the claim must be paid promptly unless the insurer has a reasonable belief that the claim is legally or factually insufficient." *Id.* The decisive question is whether the insurer had a "good faith belief, at the time its performance was requested, that it had justifiable reason for withholding payment under the policy." *Id.* (quoting *Buzzard v. McDanel*, 736 P.2d 157, 159 (Okla.1987) (*Buzzard I*).) "The knowledge and belief of the insurer during the time period the claim is being reviewed is the focus of a bad-faith claim." *Id.* (citing *Buzzard I*, 736, P.2d at 159).

¶ 11 An insurer is entitled to have any dispute concurring the reasonableness of its actions settled by a jury. "[I]f there is conflicting evidence from which different inferences may be drawn regarding the reasonableness of insurer's conduct, then what is reasonable is always a question to be determined by the trier of fact by a consideration of the circumstances in each case." *McCorkle*, 637 P.2d at 586–87. Thus, the question in this matter is whether a jury could reason-

ably infer that USAA was acting unreasonably and in bad faith.

## A. Low–Ball Offers

¶ 12 By May 16, 1994, USAA's investigation had established that Terry was an uninsured motorist who lacked any assets to satisfy a judgment, that Terry was at least 80% negligent, and that the value of the Newport claim, taking into consideration the 80/20 evaluation of comparative negligence was between $750,000 and $900,000. A litigation supervision at USAA was given authority to settle the claim for up to $900,000. However, the lawyer hired by USAA was given authority to settle the claim for up to $750,000.

¶ 13 On May 27, 1994, USAA respond to Mrs. Newports March 11th demand letter for policy limits by a offering a structured settlement with a present value later estimated to be $500,000. The proposal was rejected. On June 17, 1994, USAA responded with a second proposed settlement, also dated May 27, 1994, with a present value of approximately $600,000. Mrs. Newport rejected the second offer and offered to settle the matter for $1,325.000. Her attorney would later testify at trial that she was beginning to feel harried and was "caving in." A third settlement proposal from USAA was made on June 27th with a present value of approximately $700,-000. In this proposal USAA began to assert "the possibility and extent of negligence" in assessing the amount of loss. At trial, Mrs. Newport would assert that this was for the purpose of instilling fear. The offer was rejected and a counter offer was made for $1,175,000. In that response, Mrs. Newport's lawyer complained that USAA continued to make its offers in the form of a structured settlement without disclosing the present value of the offers. On August 3, 1994, USAA made a "once and for all" offer with a present value latter estimated to be $750,000. In it, USAA's lawyer stated: "I

have tried several cases in which the jury found for the defendant under similar weather and road conditions due to an unexpected ice and snow storm." This was the first indication that USAA believed it had an unavoidable accident defense. USAA's attorney also asserted that "USAA ha[d] not revealed the actual cost of the annuities offered [present value] because to do so would possibly subject the entire settlement to taxation." At trial Mrs. Newport's former attorney testified that this was simply not true. On October 7, 1994, Mrs. Newport rejected the offer and withdrew all previous settlement offers she had made. Four days later, this suit was filed.

¶ 14 Mrs. Newport maintains that she established a *prima facie* case of bad faith with undisputed evidence of "low balling," an insurer's intentional offer of a sum less than its own valuation of the claim. USAA contends that an offer less than the insurer's own internal estimated value is not bad faith. It notes that no reported case from any jurisdiction so holds.

¶ 15 Authority on this issue is indeed scant. It appears that no state appellate court has addressed this issue directly in a published opinion.[1] However, a duty to promptly pay a valid claim has been clearly recognized by this Court's jurisprudence since an insurer's duty of good faith and fair dealing was articulated in *Christian,* 577 P.2d 899. An insurer may not treat its own insured in the manner in which an insurer may treat third-party claimants to whom no duty of good faith and fair dealing is owed.

¶ 16 This Court holds that following "an investigation reasonably appropriate under the circumstances," *Buzzard II,* 824 P.2d at 1109, an insurer must promptly settle the claim for the value or within the range of value assigned to the claim as a result of its investigation. An insurer's failure to do so may subject it to a claim for bad faith from

---

1. Research reveals only two federal decisions which have addressed the issue of insufficient payment or insufficient offer in the context of a claim for bad faith. See *Shufford v. Integon Indemnity Corp.,* 73 F.Supp.2d 1293, 1302 (M.D.Ala.1999) ("Not only an outright refusal to pay, but also either an unwarranted delay in payment or an insufficient payment can form the grounds for a breach-of-contract claim."); Kosierowski v. Allstate Ins. Co., 51 F.Supp.2d 583, 592 (E.D.Pa.1999) (offer of half of amount adjustor was authorized to offer did not constitute bad faith under Pennsylvania law when value of claim was uncertain).

its insured. This is not to say an insurer may not negotiate or litigate the value of the claim. The duty of good faith and fair dealing merely prevents an insurer from offering less than what its own investigation reveals to be the claim's value.

¶ 17 The Court of Civil Appeals in this matter held that there was no bad faith because the claim was not actually denied and negotiations were ongoing. However, an offer to make an insufficient payment is equivalent to a denial of that portion of the claim lying between the insurer's offer and the value or range of value which the insurer has assigned to the claim. Offers below the insurer's own calculation of the value of the claim are not a valid justification for withholding payment.[2]

¶ 18 The first three of USAA's pre-litigation offers fell below the value it assigned to the Newport claim. A jury could reasonably conclude that USAA was not negotiating in good faith with its insured. The portion of the opinion of the Court of Civil Appeals opinion which holds that there was no bad faith is vacated.

### B. Medical and Funeral Bills

¶ 19 USAA's senior claims examiner, Folgate, instructed the claims investigator, Lancaster, to assist the Newports in any way he could to minimize their out-of-pocket expenses. Further, Lancaster was directed to inform the Newports that their UM coverage was available for their immediate needs.

¶ 20 Lancaster made contact with Davison, the Newport's lawyer, on December 9, 1993. They discussed the accident, Mr. Newport's injuries, Mr. Newport's increased paralysis, and his transfer to Oklahoma City. They also discussed the need for payment of medical bills. Lancaster told Davison that USAA was making the UM portion of the Newport policy available to them for expenses such as medical bills. The conversation was followed by a letter from Lancaster dated December 16, 1993, to Davison which stated: "we are making our uninsured motorist portion of the policy available to Mr. Newport in hopes of alleviating any problems which might arise concerning his medical condition." A similar conversation took place between Davison and Folgate on December 15, 1993. On December 23rd, USAA advanced $5,000 to help cover additional living expenses while the Newport family was in Oklahoma City. Following Mr. Newport's death on January 3, 1994, Lancaster sent a second letter stating: "again, we offer any assistance to the family that is needed on a more immediate basis." It was Lancaster's intent that the UM policy would be available to pay medical and funeral expenses.

¶ 21 On March 11, 1994, Davison made a written demand for payment of the policy limits, including payment of the medical and funeral bills, less the $5,000 advance. As medical liens were filed and bills were received from medical providers, Davison made a second demand for payment. But despite Davison's demands and Lancaster's request to USAA that it pay Newport's medical bills, USAA never paid the medical or funeral bills.

¶ 22 USAA defends its inaction by arguing that nothing in the insurance contract required it to pay any medical or funeral bills. It notes that no "med-pay"[3] coverage was purchased by the Newports. USAA's expert at trial attributed Lancaster's offers of financial assistance and the $5,000 advance in part to the "Christmas spirit."

¶ 23 The issue is not, however, whether USAA was obligated to provide medical coverage under a provision in its contract with the Newports. Payment of the medical and

---

2. Not every cause in which an insurer offers to settle a claim at a value less than that at which it originally evaluated a loss will support an award of bad faith damages. Under the facts presented—where the insurer's original offer was $250,000 less than the lowest value estimated for the claim, where offers were tendered which were difficult to appraise at a current value, and where the final offer [the first one which fell within the appraised value of the claim] was accompanied by a threat that the insured might come away with nothing at trial—bad faith damages are recoverable.

3. "med-pay" is separate contractual coverage between the insurance company and the insured to reimburse the insured for medical expenses incurred from an automobile accident.

funeral expenses was sought as part of the Newport's claim for the losses incurred as a result of Mr. Newport's collision with an uninsured motorist, not as med-pay coverage. The issue is whether USAA dealt with the Newports fairly and in good faith.

¶ 24 USAA promised to make the uninsured motorist coverage available, made a small advance towards that end, and then refused to make further payment on the claim outside a settlement far below the dollar value placed on the claim based on its own investigation. USAA's actions in handling the Newport's claim could reasonably be perceived as unreasonable and in bad faith. Therefore, it was for the jury to determine whether USAA's actions were reasonable under the circumstances.

## II. BIFURCATION AND *BUZZARD'S* RELEVANCE LIMITATION ON CERTAIN EVIDENCE

¶ 25 USAA urges that bifurcation of trial of the issues of Terry's responsibility for the collision and USAA's bad faith was required. Mrs. Newport claims the trial court lacked discretion to order bifurcation in this case. Amici Curiae, State Farm Mutual Automobile Insurance Company and the Oklahoma Trial Lawyers Association, have briefed the issues addressed in this section.

### A. Bifurcation

 ¶ 26 The controlling law on bifurcation is found in this Court's decision in *Buzzard I*, 736 P.2d 157. There, insureds brought an action against their UM carrier for its bad-faith refusal of the claim. The trial court granted the insurer's motion to bifurcate trial of the issues of bad faith and whether insureds were legally entitled to recover from the underinsured motorist. The underinsured motorist had previously reached a settlement with the insured and was not a party to the action. The insureds sought and obtained a writ from this Court prohibiting bifurcation. This Court held that the issue of whether the insureds had a legal right to recover from the uninsured motorist was not separable from the question of whether the insurer had a good-faith belief that it had a justifiable reason for withholding payment under the policy. *Id.* at 159. Therefore, the trial court had "no authority ... to require [the insureds] to submit to a separate trial as to the comparative fault of the [uninsured motorist]." *Id.*

¶ 27 Following a trial, the case was again submitted to this Court, this time, on the insurer's appeal from the jury's verdict for actual and punitive damages based upon the insurer's bad faith failure to honor its contract. In *Buzzard II*, 824 P.2d 1105, this Court explained that "[t]o determine the validity of the claim, the insurer must conduct an investigation reasonably appropriate under the circumstances. The knowledge and belief of the insurer during the time period the claim is being reviewed is the focus of a bad-faith claim." *Id.* at 1109 (citing *Buzzard I*, 736 P.2d at 159).

¶ 28 USAA does not ask this Court to overrule these holdings. Instead it attempts to distinguish this case from *Buzzard*. It states that *Buzzard* involved only one claim, for bad faith, brought solely against the insurer. USAA is correct in noting that the action was brought solely against the insurer. The underinsured motorist had settled with the insureds prior to the litigation. *Buzzard I*, 736 P.2d at 160 (concurring opinion). There was, however, a jury determination of the comparative fault of the two drivers in addition to the determination of bad faith.[4]

 ¶ 29 The fact that distinguishes the present case is that in *Buzzard*, the insurer did not add the underinsured motorist as a third-party defendant, perhaps due to the prior settlement. That fact alone does not make the *Buzzard I* holding concerning bi-

---

4. As the *Buzzard II* opinion notes:

The jury returned a verdict in favor of [insureds], specifically finding that the [underinsured motorist] was 73% negligent and that [the insured driver] was 27% negligent. They found that actual damages were $750,000.00 reduced by [the insured driver's] negligence to $540,000.00 but limited by the insurance policy to $10,000.00. The jury awarded actual damages for bad-faith breach of contract in the amount of $200,000.00 and $200,000.00 in punitive damages.

824 P.2d at 1108.

furcation any less applicable. An insurer may not defeat the application of the *Buzzard* holding simply by adding the uninsured motorist to the litigation.[5] The holding is not limited to the situation in which the uninsured or underinsured motorist is not present in the suit.

### B. *Buzzard's* Relevance Time Frame

¶ 30 In a similar argument USAA next challenges the application to this case of the holding in *Buzzard II*, that "[t]he information relevant at trial was that upon which [insurer] relied in refusing payment," 824 P.2d at 1114. Specifically, at trial, USAA requested an instruction on "unavoidable accident" be given to the jury and that the deposition of Mr. Newport's treating physician at the local hospital be admitted in an attempt to convince the jury that the collision did not cause Mr. Newport's death. Because other issues surround the instruction and the admission of the expert testimony, the two will be addressed separately.

### 1. Unavoidable Accident

¶ 31 USAA asserts error in the trial court's refusal to instruct on unavoidable accident. As the Court of Civil Appeals correctly held, the instruction would have been error under the facts of this case. Use of the instruction "should be restricted to those circumstances where the evidence indicates the occurrence was caused by unforeseen circumstances or conditions and not by the negligence of either party." *Ankney v. Hall*, 764 P.2d 153, 156 (Okla.1988); Oklahoma Uniform Jury Instructions (Civil) No. 10.9.

¶ 32 Use of the instruction in this matter was not indicated. The roads were visibly icy during a sleet storm. In addition, USAA's investigation and evaluation of the claim had always indicated negligence on the part of one or both parties.

¶ 33 Further, the issue of unavoidable accident was not relevant to the knowledge and belief of USAA at the time the Newport claim was being evaluated. It was not until its fourth offer of settlement on August 3, 1994, well into settlement negotiations and long after it evaluated the claim on May 16, 1994, that USAA intimated its intention to assert the defense. The absence of any mention of the defense prior to that time gives rise to an inference that its mention in the fourth offer was intended to coerce a settlement. The trial court did not err in refusing to give an unavoidable accident instruction.

### 2. Causation

¶ 34 USAA complains that the trial court excluded evidence "that might have convinced the jury that Terry did not cause Newport's death, or at least his alleged 39–day long pain and suffering." USAA wanted to admit the deposition of Dr. Borne, Mr. Newport's treating physician at the local hospital, to establish that no x-ray or CAT scan had established an actual fracture of Mr. Newport's neck. USAA's argument was that Mr. Newport's death was attributable to his (1) prior medical condition, (2) a "significant event" during physical therapy at the local hospital which resulted in paraplegia, (3) pneumonia, which he developed in the hospital, and ultimately (4) cardiac arrest. Thus, USAA argued that Mr. Newport's 39–day hospital stay, which ended with his death, was not attributable to the collision.

¶ 35 Evidence of Mr. Newport's prior medical condition had been presented as part of Plaintiff's case in chief because it was relevant to Mr. Newport's life expectancy and damages. Dr. Borne's deposition, taken five days before trial, was excluded following the trial court's review of the law of intervening cause and the *Buzzard* opinions, as cumulative and because it was taken by the attorney USAA had hired to negotiate the claim. That attorney was to be a witness at trial.

---

5. USAA knew early in its investigation that Terry was sixteen, was uninsured, and that he had no assets from which to satisfy a subrogation claim. Neither Mrs. Newport nor USAA sought payment of damages from Terry. The jury was instructed only to determine the amount of damages suffered as a consequence of the wrongful death of Mr. Newport. Under *Keel v. M.F.A. Insurance Co.*, 553 P.2d 153, 158 (Okla.1976), an insured may litigate the issue of responsibility for the accident against the UM insurer alone or with both the insurer and the uninsured motorist.

As part of USAA's offer of proof, the deposition was made part of the record for appeal.

¶ 36 The trial court did not abuse its discretion in excluding the deposition. It was not relative to the issue of USAA's belief at the time it evaluated the Newport claim. In fact, nothing in it was an issue in this matter until shortly before trial. USAA's investigation revealed that Mr. Newport had complained at the scene that he could not move his neck and that he had suffered some paralysis.[6] During negotiations, USAA never disputed that the collision had caused Mr. Newport's injuries and death. In its answer to Mrs. Newport's Petition, USAA admitted "the occurrence of the accident on November 25, 1993, and resulting injury to Bobbie D. Newport." No mention of the defense appears in the Pretrial Conference Order entered less than two weeks prior to trial.

¶ 37 During "the time period the claim [was] being reviewed," *Buzzard II*, 824 P.2d at 1109, there is no indication that USAA believed Mr. Newport's injuries were attributable to anything other than the collision. Despite written authority given in March, 1994 to obtain Mr. Newport's medical records, USAA chose to evaluate the claim without those records on May 16, 1994.

¶ 38 In addition, the trial court correctly observed that the information in Dr. Borne's deposition was cumulative. Most of the deposition centered on Mr. Newport's medical history. This included the fact that Mr. Newport suffered from ankylosing spondylitis, a fusion of the spine in fixed position, as a result of an ejection seat accident while he was in the Air Force in the 1950's. The condition left him slumped forward and unable to lay flat. He also suffered from emphysema and other health problems. After extensive review of Mr. Newport's medical history, Dr. Borne was asked whether the x-rays or CAT scans from the local hospital revealed a fracture in the spine. Dr. Borne stated that none could be seen and explained that the more sensitive MRI could not be performed, however, due to the size of the MRI unit at the local hospital and Mr. Newport's posture. Dr. Borne agreed with the medical examiner's notation on the death certificate that the injury was received in a motor vehicle collision and that Mr. Newport died from sepsis and pneumonia, complications of a cervical spine fracture/dislocation. Nothing in Dr. Borne's deposition attributed the cause of death to anything other than the collision.

¶ 39 Nor does Dr. Borne's testimony present facts which would give rise to a legitimate assertion of intervening cause.[7]

---

**6.** A witness to the collision states that even before he could be removed from his car, Mr. Newport "complained of his neck. He stated he couldn't move his neck." In a "Telephone Assignment Confirmation" from USAA, the investigator is asked to perform a "full liability investigation," including "the condition of paralysis and how permanent it may be." The document is dated November 29, 1993, more than a week before the physical therapy "event" which USAA now claims to have caused Mr. Newport's paralysis.

The investigators's description of Mr. Newport's injury first appears in a report to USAA dated December 16, 1993. It states:

Initially Mr. Newport had received paralysis from his neck down. While in the hospital he did recover the use of his legs and of his arms to a certain extent. On approximately December 8, Mr. Newport was diagnosed as having pneumonia and was in critical condition. He was transported to an Oklahoma City hospital. They also discovered at that time that he had lost his feeling from his upper chest down and could no longer move his legs at all. Also, he was still able to move his hands, but at that point they were afraid of the possibility that

Mr. Newport could die. In talking with relatives on December 13, I was able to find out that Mr. Newport had recovered somewhat, but was still in critical condition and in ICU in an Oklahoma City hospital. He still had not regained any feeling in his upper chest down, and could not move his legs. He was still able to move his arms at that time.

**7.** An intervening cause is one that interrupts or breaks the connection between a defendant's act [or omission] and a plaintiff's injury.

[Defendant's] act [or omission] would not be the direct cause of [Plaintiff's] injury if another event intervened between the two and that event was:
1. Independent of [Defendant's] act [or omission];
2. Adequate by itself to cause [Plaintiff's] injury; and
3. Not reasonably foreseeable by [Defendant].
Oklahoma Uniform Jury Instructions (Civil) No. 9.8.

The result of the "significant event" to which USAA wishes to attribute Mr. Newport's initial paralysis was actually the onset of paraplegia during physical therapy on December 3, 1993. When asked if he had an opinion about what happened during the physical therapy procedure that caused the pain and numbness followed by complete paralysis, Dr. Borne responded by saying he had no idea. Thus, the trial court was correct in holding that there was no evidence of intervening cause to submit to the jury.

### III. JURY VERDICT AND AWARD OF PUNITIVE DAMAGES

#### A. Jury Verdict

¶ 40 The jury's verdict in this matter presents a situation which has not been specifically addressed in a published opinion of an appellate court in Oklahoma. Did the trial court abuse its discretion by directing the jury to reconsider its verdict rather than correcting the verdict as a matter of law? The question applies to two aspects of the jury's verdict.

¶ 41 The jury was instructed to determine the "full amount of any damages sustained as a result of the occurrence" The instruction failed to mention that only 1.5 million dollars of the damages, the policy limits, would be recoverable from USAA. The jury fixed the dollar amount of damages resulting from the collision in the sum of six million dollars.[8]

¶ 42 The jury was also instructed on Mrs. Newport's claim for actual and punitive damages based on USAA's bad faith. The instruction on punitive damages stated that "[i]n no event should the punitive damages exceed the amount of actual damages award-ed." The instruction did not distinguish between actual damages on the claim for UM benefits, for which no punitive damages are available, and actual damages on the bad-faith claim. The jury returned a verdict of 1.5 million dollars actual damages on the bad-faith claim and 7.5 million dollars in punitive damages.

¶ 43 After polling the jury twice as to the verdicts, the trial court, over USAA's objection, returned the jury to re-read the punitive damages instruction and, at the jury's request, furnished new verdict forms on the claims for compensatory damages. The jury returned with a verdict of 1.5 million dollars as the amount of damages suffered as a result of Donovan Terry's negligence, 7.5 million dollars in actual damages on the bad-faith claim, and 7.5 million dollars in punitive damages. The trial court entered judgment on the second jury determination despite USAA's urging that the errors could be corrected by the court as a matter of law.

¶ 44 As a general rule, where the jury returns a verdict that is incomplete, ambiguous, or in disregard of the instructions, the trial court should direct the jury to retire to the jury room for further deliberations. *Stephens v. Draper*, 350 P.2d 506, 509 (Okla.1960). Thus, this rule has been applied where jurors signed a verdict for the plaintiff but failed to fill in the blanks provided for the amounts to be awarded, *Id.* at 507, where the jury violated its instructions by apportioning damages between two joint tort feasors, *Kansas City S. Ry. Co. v. Marrow*, 326 P.2d 817 (Okla.1958), and where the jury failed to fix the amount of the plaintiff's recovery, *Keener v. Tully*, 263 P.2d 513 (Okla.1953). By negative implication, howev-

8. Initially, the jury returned the following verdict:

| In Favor Of | On the Issue of | In the Amount of |
| --- | --- | --- |
| Plaintiff | Negligence [of Terry] | $6 million [damages from collision] |
| Plaintiff | Bad Faith | $1.5 million |
| Plaintiff | Punitive Damages | $7.5 million |

The jury returned to deliberate and returned the following verdict:

| In Favor Of | On the Issue of | In the Amount of |
| --- | --- | --- |
| Plaintiff | Negligence | $1.5 million |
| Plaintiff | Bad Faith | $7.5 million |
| Plaintiff | Punitive Damages | $7.5 million |

er, a jury should not be directed to re-deliberate unless the verdict is incomplete, ambiguous, or in disregard of the instructions.

### 1. Verdict on Claim for Policy Benefits

¶ 45 Here, there is no indication that the jury misapprehended the instructions regarding the amount of damages resulting from the collision or that the jury's verdict was in any way inconsistent with it. The instruction did not explain that policy limits would limit recovery against USAA to 1.5 million dollars. But nothing prevented the trial court from giving effect to the policy limits when he entered judgment on the jury's verdict. The jury could not be reasonably expected to cure the legal insufficiency in the instruction it was given. Under such circumstances, the jury should not have been directed to re-deliberate. The verdict resulting from the jury's instructions could and should have been corrected by the trial court as a matter of law. The trial court abused its discretion by not doing so. On remand the trial court shall enter judgment in the amount of policy limits, 1.5 million dollars, on Mrs. Newport's claim for UM policy benefits.

### 2. Verdict on Claim for Bad Faith

¶ 46 The verdict for actual damages on the claim for bad faith should also have been corrected as a matter of law. The punitive damages instruction [9] stated that "[i]n no event should the punitive damages exceed the amount of actual damages awarded." [10] The instruction did not distinguish between

---

9. Instruction Number 43

EXEMPLARY OR PUNITIVE DAMAGES
If you find in favor of Plaintiff, and grant her actual damages, and if you find the conduct of Defendant, United Services Automobile Association, was [or amounted to]:
Oppression;
Malice; or
Wanton or reckless disregard of another's rights;
then you may, in addition to actual damages, grant Plaintiff punitive damages in such sum as you reasonably believe will punish Defendant, and be an example to others.
Oppression involves an act or failure to act that is done in a manner which injures another person with unnecessary harshness by misuse or abuse of authority or power, or by taking advantage of some weakness, disability, or misfortune of another person.
Malice involves either hatred, spite, or ill-will, or else the doing of a wrongful act intentionally without just cause or excuse.
The conduct of Defendant United Services Automobile Association was in wanton or reckless disregard of another's rights if Defendant was either aware, or did not care, that there was a substantial and unnecessary risk that its conduct would cause serious injury to others. In order for the conduct to be in wanton or reckless disregard of another's rights, it must have been unreasonable under the circumstances, and also there must have been a high probability that the conduct would cause serious harm to another person.
Punitive damages are not to be considered as compensation to Plaintiff, Sammie Lou Newport, as Personal Representative of the Estate of Bobby D. Newport, deceased, but as punishment of Defendant, United Services Automobile Association, and as an example to others to deter them from like conduct. The law does not require you to award punitive damages, and if you do so, you must use sound reason in setting the amount. You should be aware that the purpose of punitive damages is to punish, and not destroy, a defendant. In determining the amount of punitive damages, you may consider the following factors:
1. The harm that Defendant United Services Automobile Association's conduct has already caused and is likely to cause;
2. The degree of wrongfulness of Defendant United Services Automobile Association's conduct;
3. How long the conduct lasted and whether it is likely to continue;
4. Whether there was other similar conduct, and if so, how often it occurred;
5. How aware Defendant United Services Automobile Association was of the conduct and its consequences, and whether there were attempts to conceal the conduct;
6. Whether Defendant United Services Automobile Association benefitted from the conduct, and it so, whether that benefit should be taken away;
7. The need to discourage others from similar conduct; and
8. The financial resources of Defendant United Services Automobile Association.
In no event should the punitive damages exceed the amount of actual damages awarded.

10. This action was filed prior to the "Tort Reform" legislation which took effect on August 25, 1995. Therefore, the trial court proceeded under section 9 of title 23 which provides:

A. In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of conduct evincing a wanton or reckless disregard for the rights of another, oppression, fraud or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of

actual damages on the claim for policy benefits and actual damages on the bad-faith claim. The jury could not be reasonably expected to cure the legal insufficiency in the instructions it was given.

¶ 47 The verdict resulting from the jury's instructions could and should have been corrected by the trial court as a matter of law. The trial court abused its discretion by not doing so. On remand the trial court shall enter judgment in the amount of policy limits, 1.5 million dollars, on Mrs. Newport's contract claim for UM benefits against USAA, 1.5 million dollars, the jury's initial determination, on her bad-faith claim, and 1.5 million dollars in punitive damages.

example, and by way of punishing the defendant, in an amount *not exceeding the amount of actual damages awarded.* Provided, however, if at the conclusion of the evidence and prior to the submission of the case to the jury, the court shall find, on the record and out of the presence of the jury, that there is *clear and convincing evidence* that the defendant is guilty of conduct evincing a wanton or reckless disregard for the rights of another, oppression, fraud or malice, actual or presumed, then the jury may give damages for the sake of example, and by way of punishing the defendant, and *the percentage limitation on such damages set forth in this section shall not apply.*

(emphasis added). In this matter, there was no determination by the trial court that there was "clear and convincing evidence" of wanton or reckless disregard for the rights of another, oppression, fraud or malice, actual or presumed." Thus, the jury was instructed that an award of punitive damages could not exceed the amount of actual damages awarded.

In 1995, the Oklahoma Legislature repealed section 9 and enacted section 9.1 Subsection A provides the following standard for the award of punitive damages:

A. In an action for the breach of an obligation not arising from contract, the jury, in addition to actual damages, may, subject to the provisions and limitations in subsections B, C and D of this section, give damages for the sake of example and by way of punishing the defendant based upon the following factors: the seriousness of the hazard to the public arising from the defendant's misconduct; the profitability of the misconduct to the defendant; the duration of the misconduct and any concealment of it; the degree of the defendant's awareness of the hazard and of its excessiveness; the attitude and conduct of the defendant upon discovery of the misconduct or hazard; in the case of a defendant which is a corporation or other entity, the number and level of employees involved in causing or concealing the misconduct; and the financial condition of the defendant.

Okla. Stat. tit. 23, § 9.1(A) (Supp.1995). Section 9.1 then specifically addresses an award of punitive damages against an insurer in subsections B, C, and D, which provide:

B. Category I. Where the jury finds by clear and convincing evidence that the defendant has been guilty of reckless disregard for the rights of others, or an insurer has recklessly disregarded its duty to deal fairly and act in good faith with its insured, the jury, in a separate proceeding conducted after the jury has made such finding and awarded actual damages, may award exemplary damages in an amount not to exceed the greater of:
1. One Hundred Thousand Dollars ($100,000.00); or
2. The amount of the actual damages awarded.
C. Category II. Where the jury finds by clear and convincing evidence that;
1. The defendant has acted intentionally and with malice towards others;
2. An insurer has intentionally and with malice breached its duty to deal fairly and act in good faith with its insured,
the jury, in a separate proceeding conducted after the jury has made such finding and awarded actual damages, may award exemplary damages in an amount not to exceed the greatest of:
a. Five Hundred Thousand Dollars ($500,000.00),
b. Twice the amount of actual damages awarded, or
c. The increased financial benefit derived by the defendant or insurer as a direct result of the conduct causing the injury to the plaintiff and other persons or entities.
The trial court, shall reduce any award for punitive damages awarded pursuant to the provisions of subparagraph c of this paragraph by the amount it finds the defendant or insurer has previously paid as a result of all punitive damage verdicts entered in any court of the State of Oklahoma for the same conduct by the defendant or insurer.
D. Category III. Where the jury finds by clear and convincing evidence that:
1. The defendant has acted intentionally and with malice towards others; or
2. An insurer has intentionally and with malice breached its duty to deal fairly and act in good faith with its insured, and the court finds, on the record and out of the presence of the jury, that there is evidence beyond a reasonable doubt that the defendant or insurer acted intentionally and with malice and engaged in conduct life-threatening to humans, the jury, in a separate proceeding conducted after the jury has made such finding and awarded actual damages, may award exemplary damages in any amount the jury deems appropriate, without regard to the limitations set forth in subsections B and C of this section.

### B. Award of Punitive Damages

¶ 48 USAA asserts that the award of punitive damages in this matter was unjustified. This Court does not agree.

¶ 49 This Court has long held that "[a]n insurer's violation of the implied duty to deal fairly and act in good faith 'gives rise to an action in tort for which consequential, and in a proper case, punitive damages may be sought.'" *McLaughlin v. National Benefit Life Ins. Co.*, 772 P.2d 383, 385 (Okla. 1988) (quoting *Christian*, 577 P.2d at 904). But "[c]learly, punitive damages do not ipso facto follow from every breach of this duty or in every case [in which] a jury may render a verdict for the wronged party." *Id. See also Willis v. Midland Risk Ins. Co.*, 42 F.3d 607, 614–615 (10th Cir. 1994) ("Even where there is evidence to support the recovery of actual damages in a bad faith action against an insurer, submission of the issue of punitive damages to a jury may be improper.").

¶ 50 Under the applicable version of the punitive damages statute, "[t]he availability of a punitive damages award is not automatic, but rather is governed by the standard applicable in other tort cases. The plaintiff must show that the defendant acted with oppression, malice, fraud or gross negligence or wantonness." *Buzzard II*, 824 P.2d at 1115. "The act which constitutes the cause of action must be activated by or accompanied with some evil intent, or must be the result of such gross negligence—such disregard of another's rights—as is deemed equivalent to such intent." *Slocum v. Phillips Petro. Co.*, 678 P.2d 716, 719 (Okla.1983).

¶ 51 The evidence presented at trial demonstrated USAA's bad faith in its handling of the Newport claim. Based on this Court's review of the transcripts, exhibits and record on appeal, the jury was justified in finding oppression, malice, or wanton or reckless disregard of the Newport's rights. Further, the amount of punitive damages, which are today limited to the amount of 1.5 million dollars by the award of 1.5 million dollars in actual damages for bad faith, is not grossly excessive, nor does it appear to be

the result of passion, prejudice, or improper sympathy. The award, as corrected is neither unjustified nor excessive.

### IV. ATTORNEY FEES

¶ 52 USAA challenges the trial court's award of $428,019.00 in attorney fees. It asserts error because (1) the award did not distinguish between a claim for which attorney fees are recoverable and one for which they are not, and (2) the amount of attorney fees is unjustified and unreasonable. USAA also objects to Mrs. Newport's request for appeal-related attorney fees.

¶ 53 This issue is controlled by today's pronouncement in *Barnes v. Oklahoma Farm Bureau Mutual Insurance Co.*, 2000 OK 55, 11 P.3d 162 (2000) (rehearing time pending). There, this Court reaffirmed its commitment to the American Rule that, with certain limited exceptions, attorney fees are not recoverable in the absence of contractual provision or specific statutory authority allowing their recovery. *Id.* at ¶¶ 45–56, 11 P.3d at 178–182.

¶ 54 As in *Barnes*, Mrs. Newport was not provided the opportunity to apply for fees under a recognized exception to the American Rule. On remand, the trial court shall determine whether Mrs. Newport can prove herself entitled to such fees under a recognized exception to the American Rule.[11]

### V. SUMMARY OF HOLDINGS AND DIRECTIONS ON REMAND

¶ 55 The trial court did not err by submitting the issue of bad faith to a jury. There was evidence of USAA's conduct from which a jury could reasonably conclude that it had not handled the Newports' claim in good faith and had not dealt with them fairly. From that evidence, an inference of oppression, malice, or wanton or reckless disregard of the Newports' rights could also reasonably be found on the part of USAA, justifying the submission of punitive damages to the jury. Also, the trial court's refusal to bifurcate

---

11. This Court's disposition of the attorney fee issue makes it unnecessary to rule on Mrs. Newport's motion to award attorney fees for appeal related services.

claims and the limitations it set on certain evidence, based on the *Buzzard* holdings, were not error.

¶ 56 There was, however, error in the trial court's refusal to accept the initial jury verdict and correct it as a matter of law. The judgment entered on the second jury verdict is, therefore, reversed. On remand, the trial court is directed to enter judgment in the amount of 1.5 million dollars for UM policy benefits, 1.5 million dollars actual damages on the claim for bad faith, and 1.5 million dollars punitive damages on that claim. Further, the award of attorney fees must also be reversed. On remand, the trial court is authorized to determine whether Mrs. Newport's claim for attorney fees falls within a recognized limited exception to the American Rule.

CERTIORARI PREVIOUSLY GRANTED; OPINION OF COURT OF CIVIL APPEALS VACATED; TRIAL COURT AFFIRMED IN PART; REVERSED IN PART; CAUSE REMANDED TO TRIAL COURT WITH DIRECTIONS.

¶ 57 HODGES, LAVENDER, KAUGER, WATT, BOUDREAU, JJ., concur.

¶ 58 WINCHESTER, J., concurs in part; dissents in part.

¶ 59 OPALA, J. dissents.

¶ 60 SUMMERS, C.J., HARGRAVE, V.C.J., disqualified.

WINCHESTER, J., concurs in part; dissents in part:

¶ 1 I concur in the judgment for UM policy benefits, but I must dissent to the award for bad faith. The undisputed facts of this case do not support such an award.

OPALA, J., dissenting.

¶ 1 I cannot join today's pronouncement. I must recede from the *unforeshadowed, sua sponte* abandonment of *Brashier v. Farmers Insurance Co.*, 1996 OK 86, 925 P.2d 20, whose death warrant is given retrospective effect in violation of Art 5, §§ 52 and 54, Okl. Const. For a detailed explanation of my views, see *Barnes v. Oklahoma Farm Bureau Mut. Ins. Co.*, 2000 OK 55, 11 P.3d 162 (Opala, J., dissenting).