**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 29, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BRENT H. MANSUR, as next friend
for Betty J. Mansur,

      Plaintiff - Appellant,

  v.

PFL LIFE INSURANCE COMPANY,
an Iowa corporation, d/b/a
Transamerica Life Insurance
Company,

      Defendant - Appellee.

No. 08-5138

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 4:06-CV-00667-GKF-SAJ)**

---

Kort A. BeSore (Stephen Q. Peters, with him on the brief), of Harris, McMahan,
Peters, Thompson & Stall, P.C., Tulsa, Oklahoma, for Plaintiff - Appellant.

Jeffrey J. Wolf, The Wolf Law Firm, P.C., Southlake, Texas, for Defendant -
Appellee.

---

Before **MURPHY, BALDOCK** and **HARTZ**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

Plaintiff Brent Mansur, as next friend of Betty Mansur, appeals from a summary judgment granted by the United States District Court for the Northern District of Oklahoma in favor of PFL Life Insurance Company.[1]  A PFL long-term-care policy (the Policy) provided lifetime coverage to Mrs. Mansur for care in a nursing home or similar long-term-care facility, paying up to $80 per day during her confinement.  Although the Policy did not require payment of benefits for any services provided to her outside a long-term-care facility, it did offer the possibility of benefits for services at home—such as companion care or construction of a wheelchair ramp—if she, her physician, and PFL agreed on an alternate plan of care (APC).

This appeal concerns the meaning of the Policy's APC provision.  Plaintiff claims that because PFL agreed that the home care provided to Mrs. Mansur was appropriate, the requirements for APC coverage were satisfied and PFL should have paid $80 per day for Mrs. Mansur's home care after she left a nursing home.  Plaintiff also claims that PFL acted in bad faith (1) by offering to pay under that provision only $32 per day for one period and $48 per day for a later period, (2) by refusing to pay even those amounts when the Mansurs demanded the full $80, and (3) by refusing to waive payment of Policy premiums while Mrs. Mansur was

[1]The original appellant was Cline Mansur, as next friend of his wife Betty. Both Mr. and Mrs. Mansur have died, and the appeal is being pursued by Brent Mansur (whose relationship to Mr. and Mrs. Mansur does not appear in the record).  We will use the term *Plaintiff* to refer to both Cline and Brent Mansur in their capacities as litigants.

receiving home care. In response, PFL contends that the parties never agreed on an APC because they did not agree on payment terms, and that therefore PFL neither breached the insurance contract nor acted in bad faith. We have jurisdiction under 28 U.S.C. § 1291 and affirm the district court's summary judgment. We agree with PFL that the APC provision requires that PFL and the insured agree on payment terms.

## I.    BACKGROUND

In 1992 Mr. and Mrs. Mansur purchased the PFL Policy. The Policy provided that PFL would pay $80 for each day that Mrs. Mansur was confined in a long-term-care facility because of medical necessity. The Policy defines a long-term-care facility as "a Skilled Nursing Facility; an Intermediate Care Facility; or a Custodial Care Facility," and excludes facilities owned by a member of the insured's family. Aplt. App. at 58. At the same time, the Mansurs declined a home-health-care rider to the Policy; they purchased a separate policy from Conseco, Inc., that included home-health-care benefits.

Mrs. Mansur was admitted to the Forest Hills Assisted Living and Healthcare Center on September 2, 2004. Except for one week in October 2004, she received care at Forest Hills until November 22, 2004, when she returned home. PFL paid Mrs. Mansur's claim for her stay at Forest Hills.

Although again living at home, Mrs. Mansur was substantially disabled. Suffering from dementia, she was incontinent and unable to stand, walk, dress or

feed herself, or go to the toilet without assistance. She received care at home from visiting nurses and therapists. In addition, a nursing-care service provided her with five to six hours of nursing care per day, which increased to 11 hours per day on February 1, 2005, and to 24 hours per day on March 13, 2005. On August 25, 2005, Mr. Mansur terminated the nursing-care service and hired two nurses to care for his wife. The cost of Mrs. Mansur's care throughout her stay at home apparently exceeded $80 per day.

The Mansurs initially received payments under the Conseco policy for Mrs. Mansur's home-health-care expenses. But when the Conseco benefits were about to run out, Mr. Mansur looked into possible coverage under the PFL Policy. On March 16, 2006, his attorney wrote PFL, describing Mrs. Mansur's condition and seeking benefits under the Policy. The letter did not mention the Policy's APC provision, nor did it quote or cite any provision of the Policy.

On April 6, 2006, PFL responded. Its letter noted the payments already made for Mrs. Mansur's confinement at Forest Hills and described the Policy's coverage, including the APC provision. It stated that PFL "may be able to consider" APC benefits, *id.* at 204, and invited Mr. Mansur to submit proof-of-loss documents. This offer to consider paying APC benefits was not required by the Policy. The availability of APC benefits is limited by the Policy to insureds currently receiving care in a nursing home, and, as PFL knew, Mrs. Mansur had left the nursing home about 16 months before the Mansurs' attorney sent his

letter. *See* Policy, *id.* at 61 ("If an Insured Person is confined in a Long Term Care Facility and is receiving benefits under this Certificate, We will consider, instead, paying benefits for the cost of services provided under a written, medically acceptable, alternate plan of care.").

Four months later, on August 14, 2006, the Mansurs' attorney responded, sending PFL the requested information. Apparently recognizing that a request for APC benefits was untimely, the letter complained of PFL's failure to take the initiative:

> We believe that [PFL] had a duty to inquire into Mrs. Mansur's care plan and even assist her and her husband in developing her home health care plan following her dismissal from Forest Hills and provide the benefits that she was entitled to receive under this policy, rather than sit back and let her aged husband struggle with these issues knowing full-well that he would have a difficult time dealing with this claim. We also believe that [PFL] should pay the full benefit to Mrs. Mansur from the date she was checked out of Forest Hills.

*Id.* at 209. The letter claimed benefits at a rate of $80 per day for the 630 days that Mrs. Mansur had been home since leaving the nursing home on November 22, 2004—a total claim of $50,400.

On August 29, 2006, PFL sent the Mansurs' attorney a letter stating that it had determined that APC benefits were "in order for November 22, 2004 through August 24, 2005," because documentation from the Mansurs showed that Mrs. Mansur was disabled during that time. *Id.* at 211. It offered to pay 40% of the long-term-care benefit—that is, $32 per day—for that period; it said that PFL

-5-

would be sending an APC agreement with those terms and that the agreement should be returned in 14 days. As for benefits after August 24, 2005, the letter said that PFL (1) had requested additional information from a clinic that had apparently treated Mrs. Mansur and (2) was engaging an independent firm to assess Mrs. Mansur's current needs. In response to the complaint that it had not proactively advised the Mansurs of APC coverage, the letter said:

> We regret Mr. Mansur did not recall that their certificate contained an Alternate Plan of Care Benefit when Mrs. Mansur was discharged from the Nursing Home in November 2004. When we receive notification of an Insured's discharge, we typically do not presume that care will still be needed, as it is not uncommon for an Insured to be Nursing Home confined for a period of time until their care needs are such that they can return home without further help. It is the responsibility of the Insured or her representative to initiate a claim.

*Id.* at 211–12. The proposed agreement followed on September 6, 2006.

On September 13, 2006, the Mansurs' attorney wrote PFL, asking for explanations of how PFL could justify reducing the benefit below $80 per day and why PFL would require Mrs. Mansur to continue to pay premiums while she was eligible for APC benefits; the attorney also requested an extension to the 14-day deadline to respond to PFL's APC offer. On September 28, PFL replied with an offer to pay $32 per day for the period from November 22, 2004, through February 28, 2005, and $48 per day for the period from March 1, 2005, through the future date of August 31, 2007, with the possibility of renewal at that time. In explaining why payments would be below $80 per day, the letter stated:

> Regarding the benefit amount offered under the Alternate Plan of Care Benefit, please understand that the Alternate Plan of Care Benefit is not simply a substitute for the Long Term Care Benefit. The policy itself does not specify the benefit amount which would be payable for Alternate Plan of Care Benefits. Instead, it states that services under an alternate plan of care will be paid at the levels and limits specified in the plan. The amounts specified in the plan we are offering are $32.00 and $48.00 per day.
>
> When the Alternative Plan of Care Benefit is considered, it is evaluated in comparison to the Long Term Care Benefit amount purchased. If the alternative to Long Term Care Facility confinement is a lesser level of care than that for which benefits were purchased, the equivalent percentage of the alternate plan of care level is applied to the benefit amount to determine the amount of benefit available for the alternative. The services provided to Ms. Mansur at her home by private caregivers do not rise to the level of services which are provided in a Long Term Care Facility. Additionally, as discussed during our telephone conversation, there are no room and board charges to consider.

*Id.* at 214–15. The letter also explained that waiver of premiums is expressly limited by the Policy to periods of confinement in a long-term-care facility; and the enclosed proposed APC contained a paragraph stating that the waiver-of-premium benefit did not apply to the agreement.

On October 16 and November 6, 2006, having received no reply to this offer, PFL sent follow-up letters to the Mansurs' attorney. The Mansurs responded by filing suit in state court on November 14, 2006, claiming negligence, breach of contract, "Breach of Fiduciary Duty and/or Bad Faith," and conversion. *Id.* at 7. The complaint demanded the full $80-per-day long-term-

care benefit amount. PFL removed the suit to federal district court on December 11, 2006.

In district court PFL moved for summary judgment on the ground that the prerequisites for a valid APC had not been met. Plaintiff countered that insurance policies should be construed "strictly against the insurer," *id.* at 105, and that the Policy could legitimately be construed as providing a benefit of up to $80 per day for an agreed plan of care. After oral argument the district court granted PFL's motion.

On appeal Plaintiff contends that the district court erred in granting summary judgment because (1) the APC provision required agreement only with respect to the type of care to be provided and did not require agreement on payment terms, and (2) PFL acted in bad faith (a) by offering to pay only a fraction of the $80 long-term-care benefit, (b) by refusing to pay even the lower $32-per-day and $48-per-day amounts offered by PFL in its September 28, 2006, letter, and (c) by refusing to apply the Policy's waiver-of-premium provision to coverage under the APC provision. PFL responds (1) that the parties never reached agreement on an APC, and (2) that there was no bad faith on PFL's part because there was a legitimate dispute regarding whether the claim should be paid.[2]

---

[2] PFL also argues that the claim is barred because Mrs. Mansur was not confined in a nursing home at the time that she sought APC coverage, as required
(continued...)

## II.    DISCUSSION

### A.    Breach of Contract

Because the parties assume that Oklahoma law applies, we will proceed under the same assumption. *See Grynberg v. Total, S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008). Oklahoma courts interpret insurance contracts in accordance with principles applicable to all contracts. *See First Bank of Turley v. FDIC*, 928 P.2d 298, 302 & n.6 (Okla. 1996). "A contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting . . . ." Okla. Stat. tit. 15, § 152 (1993). Ordinarily, this means that the contract should be construed according to the plain meaning of its language. *See id.* §§ 154, 160. If the court finds the contract to be unambiguous, it then interprets the contract as a matter of law. *See Pitco Prod. Co. v. Chaparral Energy, Inc.*, 63 P.3d 541, 545 (Okla. 2003). An insurance policy is considered a contract of adhesion in Oklahoma, *see Dodson v. St. Paul Ins. Co.*, 812 P.2d 372, 376 (Okla. 1991), and is construed in favor of the insured when ambiguity remains after applying the rules of construction, *see id.* at 376–77.

The APC provision in the PFL Policy states:

---

[2](...continued)
by the APC provision. Plaintiff argues that PFL waived this condition. PFL replies that the Policy prohibits waiver of any conditions. We need not reach these issues, however, because we hold that PFL prevails on another, independent ground.

If an Insured Person is confined in a Long Term Care Facility and is receiving benefits under this Certificate, We will consider, instead, paying benefits for the cost of services provided under a written, medically acceptable, alternate plan of care.

*The alternate plan of care:*
(1) can be initiated by the Insured Person or by Us;
(2) must be developed by health care professionals;
(3) must be consistent with generally accepted medical practices; and
(4) *must be mutually agreed to by the Insured Person, the Insured Person's Physician and Us.*

The alternate plan of care may provide for services which differ from or are not usually covered by Your Certificate, such as:
(1) building a ramp for wheelchair access;
(2) modifying a kitchen or bathroom; or
(3) companion care or other personal care services.

*Services under an alternate plan of care will be paid at the levels and limits specified in the plan.* Benefits payable for an alternate plan of care and benefits paid for Long Term Care due to the same or related cause, in total, will not exceed the benefit limits that, in the absence of such a plan, would otherwise be payable under the Long Term Care Benefit alone.

The Insured Person's agreement to participate in an alternate plan of care will not waive any of the Insured Person's or Our rights under this Certificate.

Aplt. App. at 61–62 (emphases added).

Plaintiff does not dispute that benefits under the APC provision are dependent on the parties' agreement to an alternate plan. He contends, however, that such an agreement was reached. In his view, it was enough that agreement was reached on the type of care to be covered—that is, Mrs. Mansur's home care.

In particular, he contends that there was no need to agree on the amount of payment.

PFL counters that the payment level is an essential part of the plan, and failure to agree on that level means that no agreement was reached. We share that view. Although the first few paragraphs of the APC provision are ambiguous regarding whether the APC must include payment provisions, that ambiguity is resolved by the sentence that states: "Services under an alternate plan of care will be paid at the levels and limits specified in the plan." *Id.* at 62. The natural reading of this sentence is that the phrase beginning "at the levels and limits" modifies the immediately preceding word "paid." *Cf. Barnhart v. Thomas*, 540 U.S. 20, 26–27 (2003) (supporting Court's construction of statute with "'rule of the last antecedent,' according to which a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows"). Thus, it is the *payment* level and limits that are specified in the plan. Plaintiff contends that the phrase "at the levels and limits" modifies the word "services," which begins the sentence. But that meaning would be conveyed much more naturally if the sentence stated, "Payments will be made for the service levels and limits specified in the alternate plan of care." That is not the language contained in the Policy.

Moreover, Plaintiff's construction of the Policy is inconsistent with the flexibility inherent in the concept of an alternate plan of care. Under Plaintiff's

-11-

construction, PFL must pay for the cost of all services agreed to in the APC, subject only to the Policy maximum benefit—which is $80 per day in this case. If that is what the Policy requires, however, PFL could have an incentive to require the insured to use part-time nursing care rather than full-time companion care that includes a nursing component, even though the insured would prefer companion care and PFL, absent the requirement that Plaintiff reads into the Policy (which would require PFL to pay in full for companion care), might well be willing to pay for a portion of the companion care. Even more telling is the awkwardness, if not impossibility, of applying Plaintiff's interpretation of the APC provision to two of the services specified as available under the provision: "building a ramp for wheelchair access [and] . . . modifying a kitchen or bathroom." Aplt. App. at 62. Surely, the Policy does not contemplate that PFL would pay the contractor by advancing up to $80 per day during the work on the project. Yet paying for such a project is easily accommodated under our construction of the Policy: the parties simply agree on how much PFL will pay toward remodeling.

At first blush our interpretation of the APC language may appear to make the APC benefit an empty promise. Because PFL can refuse to agree to pay for more than a small percentage of the agreed-upon APC services, one could infer that an insured will likely receive very little, if anything, in benefits. But this perception arises only because of the peculiar factual setting of this case. As noted above, under the Policy the availability of the APC provision is limited to

-12-

occasions when the insured is confined in a nursing home and receiving benefits. In that circumstance PFL is already required to pay full benefits under the Policy and the insured is under no obligation to leave the nursing home. If PFL offers the insured too little under the APC provision, the insured can simply stay in the nursing home and continue to receive full benefits. In other words, the insured has a relatively strong bargaining position vis-à-vis PFL. In this case, in contrast, Mrs. Mansur was not in a nursing home when she sought the benefit, and, for that reason, PFL had no obligation under the Policy even to consider an APC agreement.

One might also argue that payment terms could not be part of the APC upon which the parties must agree because the Policy requires agreement by not only the insurer and the insured but also by the physician, who would have little or no interest in the payment terms. *See* Policy, *id.* at 140–41 ("The alternate plan of care . . . must be mutually agreed to by the Insured Person, the Insured Person's Physician and [PFL]."). But whenever multiple persons must agree on a course of action, some may have quite different concerns than others. Each can focus on what most interests him or her and sign off if those interests are recognized, leaving it to the others to worry about any different interests they have. Thus, nothing prevents the physician from agreeing to the plan if the medical care is satisfactory and the others agree on the payment. The position of the physician is like that of an engineer with respect to a construction contract that requires the

-13-

engineer's certificate that the contractor has conformed to plans and specifications.

Accordingly, we affirm the district court's decision that PFL did not breach its contract with the Mansurs.[3]

## B.     Bad-Faith Claim

We also affirm the district court's dismissal of Plaintiff's bad-faith claim. Under Oklahoma law an insurer has an "implied-in-law duty to act in good faith and deal fairly with the insured to ensure that the policy benefits are received." *Newport v. USAA*, 11 P.3d 190, 195 (Okla. 2000) (internal quotation marks omitted).  "The essence of a bad-faith action is the insurer's unreasonable, bad-faith conduct, including the unjustified withholding of payment due under a policy."  *Id.* (internal quotation marks omitted).  A bad-faith claim will not lie, however, when there is a legitimate dispute regarding the validity of a claim.  *See Ballinger v. Sec. Conn. Life Ins. Co.*, 862 P.2d 68, 70 (Okla. 1993).

----

[3]PFL relies on *Roland v. Transamerica Life Ins. Co.*, 570 F. Supp.2d 871 (N.D. Tex. 2008), which construed an APC provision virtually identical to the one at issue here, *see id.* at 874.  The district court in that case held that no APC benefits were due because the parties had not executed an APC agreement.  Even though the insurer had agreed to pay up to the policy maximums for home-health services specified in a plan submitted by the insured's physician, *see id.* at 875, the insured had insisted that the APC include other provisions, such as a prescription-drug benefit and waiver of premiums.  The Fifth Circuit affirmed the district court.  *See Roland v. Transamerica Life Ins. Co.*, No. 08-10941, 2009 WL 1870902 (5th Cir. June 29, 2009) (unpublished).  Although we need not, and do not, endorse all the reasoning in the opinions in that case, they do provide some support for our conclusion.

Plaintiff claims that PFL acted in bad faith by (1) offering to pay Mrs. Mansur less than the full amount of the $80 long-term-care benefit, (2) refusing to pay her even the lower $32-per-day and $48-per-day amounts offered by PFL in its September 28, 2006, letter, and (3) proposing an APC stating that the Policy's waiver-of-premium provision would not apply. A review of PFL's conduct, however, shows no bad faith.

The initial letter from the Mansurs' attorney did not point to any provision of the Policy that would provide benefits. The first mention of possible APC benefits came in PFL's response letter of April 6, 2006. PFL mentioned this possibility even though, as it knew, Mrs. Mansur had not been in a nursing home for many months and therefore did not qualify for APC benefits. *See* Policy, Aplt. App. at 140 ("*If an Insured Person is confined in a Long Term Care Facility and is receiving benefits under this Certificate*, We will consider, instead, paying benefits for the cost of services provided under a written, medically acceptable, alternate plan of care." (emphasis added)). PFL's offer may have been lower than what the Mansurs had hoped for, but it was certainly not unfair in light of PFL's having had no obligation to pay benefits. Indeed, there is no evidence that PFL calculated its offer any differently than it did for insureds who qualified for an APC benefit, when, as we have observed, the bargaining power of the insured would have been substantially greater. As for the claims that PFL acted in bad faith when it failed to pay what it had originally offered (even though the

-15-

Mansurs had not accepted the offer) and had not agreed to waive premium payments, those claims fail because PFL was not bound by an unaccepted offer and the Policy clearly waived payment of premiums only for an insured confined in a nursing home.[4] An insurer does not act in bad faith by refusing to provide benefits that it has no obligation to provide.

## III. CONCLUSION

We AFFIRM the district court's grant of summary judgment to PFL Life Insurance Company.

---

[4]The waiver-of-premium provision states:

We will waive premiums on a monthly basis while an Insured Person is confined in a Long Term Care Facility, beginning 90 days after the Insured Person has satisfied the Elimination Period and is receiving benefits for such confinement.

*The Waiver of Premium Benefit will end on the first of the following to occur*:
> (1) *the date the Insured Person is discharged from the Long Term Care Facility*;
> (2) the date the Maximum Benefit Period has been reached; or
> (3) the date the Lifetime Maximum Benefit Amount has been reached.

Coverage may be continued in force by resuming premium payments within 31 days of the date the Waiver of Premium Benefit ends.

Any unearned premiums on deposit with the Company at the time the Waiver of Premium Benefit begins will be applied following the end of the Waiver of Premium Benefit period.

App. at 141 (emphasis added).